**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

---

No. 98-51100

---

UNITED STATES OF AMERICA,

                                                            Plaintiff-Appellee,

versus

MAURICE MONTGOMERY, JR.,

                                                            Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas

---

April 19, 2000

Before BARKSDALE, BENAVIDES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This direct criminal appeal arises from the conviction following a jury trial of Maurice Montgomery ("Montgomery") for conspiracy to possess cocaine base (also known as "crack") with intent to distribute, and five counts of aiding and abetting the distribution of crack cocaine. Montgomery challenges the sufficiency of the evidence, and numerous district court rulings regarding allegations of prosecutorial misconduct. For the following reasons, we affirm his conviction.

FACTUAL SUMMARY AND PROCEDURAL HISTORY

Illicit drug activity in Killeen, Texas brought narcotics investigator Scott Lorenz ("Officer

Lorenz") from the Killeen Police Department, to undertake a long term undercover assignment where he assumed the identity of a drug dealer. Officer Lorenz moved into an apartment located at 1301 Quail Circle in Killeen, where several drug buys took place. Over the course of a four month period, Officer Lorenz purchased crack cocaine from Daryl Scott ("Scott") on at least six separate occasions. The sales involved amounts ranging from one to seven ounces of crack cocaine. [1] A surveillance team observed and recorded these transactions.

Officer Lorenz attempted to discover the identity of Scott's supplier. A confidential informant told Officer Lorenz that Scott was being supplied by a man named Maurice who lived on Hemlock Avenue in Killeen. The surveillance team observed Scott go repeatedly to Maurice Montgomery's home at 2301 Hemlock Avenue and return to Officer Lorenz, delivering crack cocaine. Scott and Montgomery were arrested after the last transaction, and the Killeen police executed a search warrant on Montgomery's home. The search produced crack cocaine residue throughout the house and residue on various instruments consistent with drug manufacture.

By grand jury indictment on February 10, 1998 Montgomery and Scott were charged in a six count indictment with conspiracy to possess cocaine base with intent to distribute, in violation of 21 U.S.C. §846 (§841(a)(1)) (Count 1), possession with intent to distribute cocaine base, and aiding and abetting in the distribution of cocaine base, in violation of 18 U.S.C.§2 and 21 U.S.C. §841(a)(1)(Counts 2, 3, 4, 5 and 6) Count two was dismissed by the district court pursuant to the Government's motion. Montgomery received a severance from Scott.

Montgomery plead not guilty and was tried before a jury beginning August 3, 1998. The jury returned a verdict of guilty on Counts 1,3,5, and 6 of the indictment and a verdict of not guilty with respect to Count 4. After several motions for a new trial were denied, Montgomery was sentenced to 160 months imprisonment, and he subsequently filed a notice of appeal.

DISCUSSION

---

[1] The transactions occurred November 7, 1997, November 13, 1997, November 25, 1997, December 11, 1997, December 18, 1997 and February 2, 1998. Each incident formed the basis of what was originally a six count indictment.

I.      SUFFICIENCY OF THE EVIDENCE

Initially, we consider whether there was sufficient evidence for a jury to find beyond a reasonable doubt that Montgomery conspired, and aided and abetted the distribution of cocaine base. We review a claim of insufficient evidence to determine whether a rational trier of fact could have found that the evidence proved the essential elements of the crime beyond a reasonable doubt. *See United States v. Ramirez*, 145 F.3d 345, 350 (5th Cir. 1998). The evidence presented at trial is viewed in the light most favorable to the government with all reasonable inferences made in support of the jury's verdict. *See United States v. Thomas*, 120 F.3d 564, 569 (5th Cir. 1997).

Count 1 of the indictment charged Montgomery with conspiracy to possess cocaine base with intent to distribute, beginning as early as November 6, 1997 and continuing until February 2, 1998. To establish a conspiracy, the government must prove beyond a reasonable doubt that (1) an agreement existed between two or more persons to accomplish unlawful ends, (2) the defendant had knowledge of the agreement, and (3) the defendant voluntarily participated. *See United States v. Casilla*, 20 F.3d 600 (5th Cir.), cert. denied, 513 U.S. 892, 115 S.Ct. 240, 130 L.Ed.2d 163 (1994). The agreement may be implicit, and the jury may infer its existence from circumstantial evidence. *See United States v. Thomas*, 12 F.3d 1350 (5th Cir.), cert. denied, 511 U.S. 1095, 114 S.Ct. 1861, 128 L.Ed.2d 483 (1994). The jury may rely on presence and association, along with other evidence thus, proof of an overt act in furtherance of the conspiracy is not required. A conspiracy or common purpose may be inferred from the development and collection of circumstances. *See United States v. Fierro*, 38 F.3d 761, 768 (5th Cir. 1994), cert. denied 514 U.S. 1051, 115 S.Ct. 1431, 131 L.Ed. 2d 312 (1995); *United States v. Robles-Pantoja*, 887 F.2d 1250, 1254 (5th Cir. 1989).

There is considerable evidence in the record regarding the surveillance of Montgomery's home at 2301 Hemlock Avenue where, on the date of each charged drug transaction, Scott went to Montgomery's house before and after each of the sales to Officer Lorenz.[2]  Scott would remain at

---

[2] The Government presented evidence that Montgomery leased and lived at 2301 Hemlock Avenue.  His dominion over the residence is not legitimately in dispute.

Montgomery's house for a few minutes, and then return to Officer Lorenz' apartment, completing the sale. In addition to evidence regarding surveillance of Montgomery's residence, the Government presented evidence gathered pursuant to the execution of a search warrant on Montgomery's home. Cocaine residue was found on the kitchen counters, the bedroom dresser, and in baggies in the garage. Measuring scales commonly used for drug manufacture were found with cocaine residue on their platforms.

Finally, the testimony of several witnesses supports the conspiracy charge. Ms. Strunk who was present when the police searched Montgomery's home testified that she obtained drugs from Montgomery and that when the police arrived, Montgomery "freaked out" and flushed the cocaine down the toilet. "Marco", the narcotics canine, alerted to the toilet when the search was executed. The Government also offered the testimony of Tracy Collins and his fiancee Ms. Foster. Both testified to Montgomery's participation in the drug trade, and asserted that they had cooked cocaine with Montgomery, manufacturing it into crack, in Montgomery's kitchen. The totality of the evidence offered by the Government is more than enough to prove that Montgomery conspired with Scott to sell crack cocaine.

Montgomery also challenges the sufficiency of the evidence for his convictions of aiding and abetting the distribution of cocaine base.[3] In order to prove that a defendant aided and abetted a criminal venture, the prosecution must prove the individual: (1) associated with the criminal enterprise, (2) participated in the venture, and (3) sought by action to make the venture succeed. *See*

---

[3] Count 3 of the indictment charged Scott and Montgomery with aiding and abetting each other in the distribution of crack cocaine, specifically on or about November 13, 1997. Count 4 charged Scott and Montgomery with aiding and abetting one another in the distribution of crack cocaine on or about December 11, 1997. Count 5 charged Scott and Montgomery with aiding and abetting each other in the distribution of crack cocaine on or about December 18, 1997. Count 6 charged Scott and Montgomery with aiding and abetting each other in the distribution of crack cocaine on or about February 2, 1998.

We do not affirm Montgomery's convictions for these charges under a *Pinkerton* theory of criminal liability, *Pinkerton v. United States*, 328 U.S. 640, 646-47, 66 S.Ct. 1180, 1183-84, 90 L.Ed. 1489 (1946), where "each conspirator may be held criminally culpable for substantive offenses committed by the conspiracy of which he is a member while he is a member", because the jury was not charged with a *Pinkerton* instruction. *United States v. Gonzalez,* 76 F.3d 1339, 1346 (5th Cir. 1996); *see United States v. Basey*, 816 F.2d 980, 997 (5th Cir. 1987); *United States v. Quiroz-Hernandez,* 48 F.3d 858, 871 (5th Cir. 1995)(a substantive conviction cannot be upheld under *Pinkerton* unless the jury was given a *Pinkerton* instruction)

*United States v. Casilla*, 20 F.3d 600, 603 (5ᵗʰ Cir. 1994). The evidence supporting a conspiracy

conviction typically supports an aiding and abetting conviction. *Id*. The evidence discussed above

which supports the conspiracy conviction easily proves that Montgomery and Scott aided and abetted

one another in the possession and distribution of cocaine base.

Based on the totality of the evidence discussed, a reasonable jury could find that Montgomery

willfully associated with Scott in this criminal venture. Supported by the surveillance evidence

establishing Scott's trips to and from Montgomery's home to obtain the crack supply for each sale

to Officer Lorenz, the jury could reasonably determine that Montgomery took affirmative steps to

further the distribution of crack cocaine. Thus, the evidence is sufficient to support Montgomery's

convictions for conspiracy and aiding and abetting in the possession and distribution of cocaine base.

II. JENCKS ACT

Next, we consider whether the district court erred in denying Montgomery a new trial on the

basis of an alleged Jencks Act violation. The Jencks Act, codified at 18 U.S.C. §3500 [4] requires the

Government to disclose a prior recorded witness statement in its possession relating to the subject

matter of that witness' testimony. Montgomery argues that the district court failed to grant him a

new trial, despite the Government's failure to turn over Jencks Act material, in the form of Officer

Lorenz' grand jury testimony, who served as the Government's leading witness at trial.

The sequence of events which led to Montgomery's motion for new trial was as follows.

Montgomery made repeated requests for the transcript of Officer Lorenz' grand jury testimony,

before and during trial. The transcript was not produced, and Montgomery's counsel cross examined

Officer Lorenz without the benefit of the transcript. The prosecutor indicated that he had ordered the

---

[4]  The text of the Jencks Act provides, in pertinent part:
> (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified... (d) if the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement... the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared. 18 U.S.C.A. §3500.

transcript, although when the Government rested, the whereabouts of the transcript were still unknown. The court inquired as to the status of the transcript, and was informed that the court reporter who transcribed the testimony had quit her job with the transcript in her possession, and could not be found. Acknowledging the problem with production, the district court decided that post- trial, he would determine if Montgomery's counsel could demonstrate inconsistencies between the testimony at trial and the testimony before the grand jury, and if counsel could do so, he would grant a new trial. Before the jury rendered its verdict the defense moved for mistrial, which the district court overruled. The court emphasized its previous ruling, and indicated it would hold the motion pending and rule on it when the transcript was produced. The transcript was not produced until ten days after the jury returned its verdict. After the court reviewed the full transcript *in camera*, Montgomery's motion for new trial was denied.

Our inquiry focuses on whether the delay in the production of Officer Lorenz' testimony prejudiced the defense. We review a district court's decision concerning an alleged Jencks Act violation for clear error. *See United States v. Martinez*, 87 F.3d 731, 734 (5th Cir. 1996). "The trial court's finding will constitute clear error where such finding either rests upon an incorrect rule of law or is inconsistent with the facts upon which it purports to rest." *Id*. In the present case, the Government did fail to turn over Jencks Act material, apparently through no fault of its own. Nevertheless, we have refused to fashion a good faith exception to the requirements of the Jencks Act; "we consider results, not motive." *United States v. Beasley*, 576 F.2d 626, 627 (5th Cir. 1978). "Unless a nondisclosure was harmless error, reversal is required even where the prosecution has acted in good faith." *United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir. 1985). Hence we find that the government's failure to produce Officer Lorenz' testimony was a violation of the Jencks Act.

Even where a violation of the Jencks Act is found, the failure to produce prior statements is subject to harmless error analysis. *See United States v. Martinez*, 151 F.3d 384, 391 (5th Cir. 1998). We strictly apply harmless error analysis and determine whether the error itself had a substantial influence on the judgment in addition to determining whether there was sufficient evidence to support

the conviction. *See United States v. Keller*, 14 F.3d 1051, 1054-55 (5th Cir. 1994). The government's failure to produce Jencks Act material at trial is harmless error where there was no substantial deviation between the statements and the witness' trial testimony. *See United States v. Sink*, 586 F.2d 1041, 1051 (5th Cir. 1978); *United States v. Edwards*, 702 F.2d 529, 531-32 (5th Cir. 1983).

We have reviewed Officer Lorenz' testimony vis-a-vis his statement before the grand jury and found them to be substantially the same. The defendant has failed to point out material deviations between the two. The primary discrepancy Montgomery's counsel alludes to regards a transaction which occurred November 7th. However Count 2 was based on the November 7th transaction, the count which was dismissed before trial. The other discrepancies between the grand jury testimony and trial testimony are similarly insufficient and simply do not pass muster. Hence, we are persuaded that the Jencks Act violation in this case was harmless error. Accordingly, we will not disturb the district court's denial of Montgomery's motion for a new trial.

Additionally, Montgomery complains that when he was finally given Officer Lorenz' grand jury transcript, the district court erred by granting the Government's motion for protective order with respect to pages 20-28 of the transcript. The Government submitted the entire transcript to the court for review *in camera* and at that time turned over a redacted copy, missing eight pages, to the defense. Upon review of the redacted portions, the district court concluded that those pages pertained to an unrelated individual, and thus the defendant was not entitled to receive the entire transcript. Montgomery focuses his complaint on the fact that the Government provided the defense with a redacted copy *prior* to the district court's conclusion that the removed pages were irrelevant. This argument is meritless. Upon review of the grand jury transcript, we agree with the district court that the redacted eight pages pertained to an unrelated case, thus Montgomery was not entitled to them. Thus, the district court did not err in its decision to redact portions of the transcript.

III.    EVIDENTIARY MATTERS

Next, Montgomery argues the district court erred by allowing the jury to deliberate and reach

a verdict without the benefit of certain requested audio taped exhibits. The Government introduced into evidence several audio and video tapes, of the various drug transactions underlying the indictment, without playing them for the jury at trial. At trial, Montgomery complained of their admission on hearsay grounds. The district court admitted the tapes, with the caveat that if the jury wished to listen to them, the court would consider at that time whether they should be redacted. On August 4th , the jury requested to listen to the tapes in the late afternoon. The very next morning they returned a guilty verdict before the tapes could be provided. Montgomery now argues that the prosecution violated his constitutional right to a fair trial, by failing to provide adequately redacted tapes in time to comply with the jury's request.

The Government argues that this court should review this issue under the same standard of review as an evidentiary ruling. We agree in light of the obscurity of this claim. Hence, the district court's decision is subject to an abuse of discretion standard and is further subject to harmless error analysis. *See United States v. De Leon,* 170 F.3d 494 (5th Cir. 1999). We are persuaded that the jury felt comfortable reaching a verdict without the tapes, since they requested to hear the tapes and then less than a day later returned a verdict.

The unredacted tapes were admitted into evidence but not heard by the jury, thus Montgomery was not prejudiced by the hearsay nature of the tapes of which he initially complained. On appeal he takes the contrary position, that he was prejudiced because the jury did not hear properly redacted tapes. He argues in part that because the tapes do not mention him by name, the jurors would have been more inclined to accept his defense. The rest of his argument is difficult to decipher.[5] In any event, considering the weight of the prosecution's evidence as a whole, Montgomery fails to establish a violation of his constitutional rights. Given our deferential standard of review, we find that the district court did not abuse its discretion regarding the tapes.

---

[5] Both parties were unsure at oral argument whether the tapes were part of the record on appeal, having been submitted into evidence by the district court. The tapes themselves are not in the record, although their transcription is. We have reviewed the transcript and see that Montgomery is not mentioned by name. Nonetheless, Montgomery does not establish that his rights were violated by the court's submission of the tapes into evidence in their entirety.

IV. BATSON CHALLENGE

Here we address whether the district court committed a *Batson* error by allowing the prosecution to strike an African-American venire-person based on the asserted race-neutral reason that the potential juror lacked the necessary intelligence to sit on the panel. Montgomery asserts that the district court erred in overruling his *Batson* challenge, upon the Government's motion to strike juror number 206 because the prosecutor "was concerned about her intelligence... on a circumstantial evidence case."

The use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth Amendment. *See United States v. Terrazas-Carrasco*, 861 F.2d 93, 94 (5th Cir. 1988). Courts address *Batson* claims under the familiar burden-shifting scheme. *See Batson v. Kentucky*, 476 U.S. 79, 96-97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *United States v. Fields*, 72 F.3d 1200, 1206 (5th Cir. 1996). "The Supreme Court has outlined a three-step process for determining whether peremptory strikes have been applied in a discriminatory manner. First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race. Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination." *See United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993). The party making the claim of purposeful discrimination bears the ultimate burden of persuasion. *Id*. at 1373.

Montgomery timely made his *Batson* motion and then the district court called on the Government to provide a race-neutral justification for the use of its peremptory strike. Because the court took that step, we no longer examine whether a *prima facie* case exists. *See United States v. Broussard*, 987 F.2d 215, 221 (5th Cir.1993). Our inquiry rests on (1) whether the government articulated a race-neutral explanation for the exercise of its challenge and (2) whether Montgomery has demonstrated that the justification given was pre-textual and that the government engaged in

purposeful discrimination. *See United States v. Webster,*162 F.3d 308, 349 (5ᵗʰ Cir. 1999).

Unless discriminatory intent is inherent in an explanation, the reason offered is deemed race-neutral. *Id.* "[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." *Bentley-Smith*, 2 F.3d at 1375. The reason tendered by the proponent need not be plausible, although "[i]t must be race-neutral and honest." *Webster*, 162 F.3d at 349. Determining whether the reason offered is an honest one turns on in-person credibility assessments which clearly the district court is in the best position to make. *See United States v. Wallace*, 32 F.3d 921, 925 (5ᵗʰ Cir. 1994)(citation omitted). Thus, we review the district court's judgment for clear error. *See Fields*, 72 F.3d at 1206.

Because of the highly deferential standard of review we employ, analysis of the *Batson* claim regarding juror number 206 turns on the district court's credibility assessment of the honesty of the prosecutor's response. At this stage of the inquiry, Montgomery bears the burden of establishing that the Government engaged in "purposeful discrimination" based on race. *Bentley-Smith*, 2 F.3d at 1373 ("The ultimate burden of persuasion always lies with the party making the claim of purposeful discrimination."). Montgomery relies on the transcript account of the colloquy between the prosecutor and the district court to support his claim. [6] Additionally the record shows that juror

---

[6]

| Mr. Snyder: | And Mrs. Massengill, do you have any children? |
| Mrs. Helen Massengill: | I have one. |
| Mr. Snyder: | And how old? |
| Mrs. Helen Massengill: | Seventeen. |
| Mr. Snyder: | And what's -- boy or girl? |
| Mrs. Helen Massengill: | Boy. |

The transcript further reads:

Mr. Snyder:

The Court: Be seated, everyone. Mr. Hilder you have a Batson challenge you wish to make?

Mr. Hilder: Yes, Your Honor. We bring a Batson challenge with regard -- we believe that the prosecutor may have exercised a peremptory challenge in a racially discriminating manner by striking a juror by the name of Helen Massengill, Juror Number 206. I'd like for the

-10-

number 206 was employed as a social worker at Texas A & M University, College Station and that she had previously sat on a jury in a civil case. Only one direct question was posed to her; whether she had any children, to which she responded "Yes", a seventeen year old son. Montgomery argues that the government's proffered reasons are pretextual, and that the government did not dismiss similarly situated white jurors, such as a white female panel member, juror number 182. We find the issue to be a close one particularly given the brevity of the questioning regarding juror number 206. Nonetheless in light of the district court's unique perspective from which to assess the credibility of the prosecutor's response, we are constrained to conclude that the trial judge did not err in his decision to deny Montgomery's *Batson* motion.

## V. PROSECUTORIAL MISCONDUCT

Finally Montgomery alleges that prosecutorial misconduct entitles him to a new trial. He contends that several remarks made by the prosecutor during closing argument were improper, specifically that the prosecutor improperly expressed an opinion as to guilt, discussed facts outside the record and mischaracterized testimony.

---

|  | record to indicate that Mr. Montgomery is, in fact a black male, the individual stricken is black. Mr. Montgomery is 30 years old. The rest of the panel is predominantly white, and that their race– and we believe that the challenge may have been exercised in a racially impermissible way. |
|---|---|
| The Court: | All Right. Mr. Snyder? |
| Mr. Snyder: | Yes, Your Honor. I would note is, is that there are several minorities on the– blacks and hispanics that are on the panel, of which the government has not stricken anyone except Ms. Massengill. Thus he has not made his prima facie case to show that the Government has stricken in a racially discriminating manner, since we left many other minorities on. With regard to Ms. Massengill, I will tell the court, is, the reason I struck her was, is that after |

listening to her, I just simply -- and I don't want to be indelicate about it, I just wasn't sure that -- that she has -- I was concerned about her intelligence, to be perfectly frank, whether she -- on a circumstantial evidence case, whether I wanted her to hear it. And it was on that basis that I struck her.

| The Court: | I thought sure you were going to say that she and her husband both work at Texas A&M. |
|---|---|
| Mr. Snyder: | No sir. I'm not prejudiced against Aggies. |
| The Court: | The Court will determine that Mr. Snyder has articulated a nondiscriminatory basis for striking that juror. The Batson challenge will be overruled. |

If this court finds that a prosecutor has made an improper comment, then we consider whether or not it prejudiced the defendant's substantive rights. *See United States v. Gallardo-Trapero,* 185 F.3d 307, 320 (5th Cir. 1999). We examine (1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt. *See United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir.1995). As this court has concluded, "[p]roper supervision requires us at least to balance the need to protect the integrity of federal trials against the practical interest in giving finality to an accurate and fair verdict; we cannot by our supervisory power reverse a conviction for trial error that was harmless." *Gallardo-Trapero,* 185 F.3d at 320 (quoting *United States v. Jones*, 839 F.2d 1041, 1050 (5th Cir.), cert. denied, 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988)).

Montgomery fails to make a showing that the prosecutor's remarks during closing argument affected his substantive rights. Some of the statements he complains of were objected to at trial and others were not, and he does not clearly set out which are preserved for our review. Further, the district court issued a cautionary instruction to the jury regarding the prosecutor's comments and Montgomery fails to articulate why this instruction was inadequate. Our discussion has already recognized the strength of the evidence against Montgomery. Montgomery's argument that the prosecutor made reference to facts outside the record is without support. As a final catch-all argument Montgomery contends that purported cumulative misconduct of the prosecutor warrants him a new trial. Since our analysis indicates no reversible error with respect to the prosecution in this case, nothing has been procured. *See United States v. Powers*, 168 F.3d 741, 754 (5th Cir. 1999)("Because the foregoing analysis has revealed no error, [appellant] has nothing to cumulate.").

CONCLUSION

For the foregoing reasons, defendant-appellant Maurice Montgomery's convictions are AFFIRMED.

RHESA HAWKINS BARKSDALE, specially concurring:

I concur in all but the statement that the **Batson** issue is "a close one". The colloquy quoted in footnote 6 of the opinion reflects that, in response to Montgomery's assertion that "[t]he rest of the panel is *predominantly* white" (emphasis added), the Government noted other minorities were *not* struck from the panel. Of course, the Government's decision *not* to peremptorily strike other minorities on the venire is *not* dispositive of the **Batson** claim. Nevertheless, it supports the district court's *credibility determination*, because it tends to negate an inference of purposeful discrimination against juror 206 because of her race. *See* **United States v. Mixon**, 977 F.2d 921, 922-23 (5th Cir. 1992).

Montgomery claims he was convicted by an "all-white" jury, and that juror number 206 was the only black person on the panel who had a realistic chance of serving on the jury. But, Montgomery did *not* include in the record any evidence from which we can determine the ethnicity or race of the venire. The Government offered a race-neutral explanation for the strike, which the district court found *credible*. Montgomery has *not* shown that *credibility determination* to be clearly erroneous.

The issue is *not* "close" merely because the Government asked juror number 206 only one question and did *not* strike a white female who was asked the same question and gave a similar answer. At issue is neither the manner nor the extent of questioning the potential juror. Obviously, numerous considerations and sources of

-13-

information came into play.

Instead, at issue is the district court's credibility determination. The opinion relies, correctly, on the "district court's unique perspective" for making that call. In sum, there is *no* basis for viewing, or characterizing, the issue as "close". To do so is confusing at best, and, at worst, may cause delaying, wasteful, or other unnecessary measures by the Government and district courts.