**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**February 17, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 02-50691
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GUSTAVO ADOLFO TENORIO; ALMA TENORIO JUAREZ;
ALEXANDER JUAREZ,

Defendants-Appellants.

Appeals from the United States District Court
For the Western District of Texas

Before JOLLY, SMITH and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Gustavo Adolpho Tenorio, Alma Tenorio Juarez and Alexander Juarez appeal their

convictions for conspiracy and aiding and abetting the knowing and intentional possession of a

quantity of marijuana with intent to distribute in violation of 21 U.S.C. §§ 846, 841(a)(1) and 18

U.S.C. § 2. They contend there was insufficient evidence to support their convictions. Finding

sufficient evidence to convict we AFFIRM their convictions.

I

Raul Carillo needed transportation to Kansas in order to validate his drivers licence. His employer referred him to a man named "Primo"[1] as a source of a ride from El Paso, Texas to Kansas. After speaking with Primo over the phone, Carillo and his adult son, Raul Carillo, Jr. ("Junior"), met up with Carlos De La Cruz and an unidentified man who were transporting a RV to Kansas City, Kansas.[2]

The RV immediately broke down in Pecos, Texas. The four men arranged for the RV to be towed to a local auto-repair shop. Carillo contacted Primo who instructed him to make arrangements to have the RV fixed. Primo informed Carillo that the other two men would be unable to make such arrangements because they did not speak English. De La Cruz left Carillo money and, without telling Carillo, made his way back to El Paso where he picked up Primo's father Gustavo Adolpho Tenorio ("Gustavo"). The whereabouts of the unidentified man remain unknown.

Left with only his son, Carillo obtained a price quote for the repairs. Carillo contacted Primo who informed him that the price was too high and that he was going to send a mechanic to fix the RV. De La Cruz reappeared and told Carillo that he had brought a mechanic. Carillo, however, never saw a mechanic. Gustavo was in Pecos with De La Cruz at this time, however, he neither worked on the RV nor did he have any contact with Carillo. De La Cruz left Carillo some money and again disappeared. Carillo contacted Primo a third time and Primo instructed him to make

---

[1] Primo was later identified as Alfonso Tenorio. Primo is the son of Gustavo Tenorio, the brother of Alma Tenorio Juarez, and the brother-in-law of Alexander Juarez.

[2] The men intended to drive straight through to Kansas. Junior went on the trip in case they needed another driver.

-2-

arrangements to tow the RV to Dallas. Carillo made these arrangements and sent his son back to El Paso.

At this point Carillo determined there was a possibility that he was unwittingly involved in illegal activity. Before leaving Pecos for Dallas, Carillo called the police. Carillo informed the officers of his situation and his belief that the RV contained illegal narcotics. The officers told Carillo to continue on to Dallas and they made arrangements to intercept the RV before it reached its destination.

Carillo and Jack Brookshire, a wrecker driver and certified peace officer, began towing the RV to Dallas. The officers eventually stopped them and Carillo gave the officers permission to search the RV. With the help of a drug sniffing dog they found almost 50 kilograms of marijuana under one of the seats.[3] The officers then arranged for Carillo and Brookshire to make a "controlled delivery" of the RV pursuant to Primo's instructions. Carillo again called Primo who instructed him to bring the RV to the parking lot of an El Carnival grocery store in the Dallas area. There Carillo would meet Primo's sister who would pay for the towing and take the RV.

When Carillo and Brookshire arrived at the parking lot they were initially met by De La Cruz and Gustavo who were in a white car. After conversing with Carillo, De La Cruz dropped Gustavo off at the El Carnival store, where Gustavo watched the RV. De La Cruz then proceeded to Primo's sister home ("the Wind Chime residence"). There he met Primo's sister Alma Tenorio Juarez ("Alma") and her husband Alexander Juarez ("Alexander"). De La Cruz returned to the El Carnival parking lot in a dark car, while Alma and Alexander drove the white car. Each car took a different route.

_____

[3] There was no humanly detectable odor of marijuana emanating from the RV.

-3-

Upon their arrival back at the parking lot, De La Cruz met up with Gustavo and the two men sat in the dark car away from the RV. Alma and Alexander drove to the RV and attempted to pay Brookshire for his services. After Brookshire rejected Alma's efforts to pay with a credit card, Alma and Alexander left in the white car. De La Cruz and Gustavo remained in the dark car, apparently watching the RV.

Alma and Alexander went to a friend's house to borrow the $1,300 needed to pay Brookshire. With Alexander present, Alma gave a false reason for needing the money and they were provided with the necessary funds. After obtaining this money, they returned to the parking lot. Alexander paid Brookshire and they all left for the Wind Chime residence. Carillo and Brookshire were in the wrecker, Alma was in the white car, and De La Cruz, Gustavo, and Alexander were in the dark car. The wrecker followed the dark car directly to the residence. The white car took a more circuitous route making several quick and erratic u-turns and it proceeded at a very slow rate of speed when it approached the Wind Chime residence. The officers testified that this driving pattern was consistent with "heat runs" which are used by narcotics traffickers to prevent detection of the "load vehicle" by law enforcement.

Once they were all at the Wind Chime residence, Brookshire unhooked the RV from the wrecker and, pursuant to Alexander's request, Brookshire gave the keys to Alexander. Carillo and Brookshire departed and Gustavo, Alma and Alexander retired to the house.[4] The officers watched the house for several hours and no one entered the RV. The officers then knocked on the front door and Alma answered. When the officers asked Alma about the RV she acted surprised and said: "There's an RV in front of my house?" She further denied knowing anything about it. Later Alma

---

[4] It is unclear from the record what happened to De La Cruz.

told the officers that an "unknown" person had asked to park the RV in front of her house for a fee. She stated that the "unknown" person had approached her earlier that day at the El Carnival store.

The officers also immediately questioned Alexander about the RV and he told them that he had never seen the RV before. He then refused to answer questions. Finally, the officers questioned Gustavo who also denied any knowledge of the RV. He stated that he and Alma had gone to the El Carnival store and produced a receipt from earlier in the day. He further stated that when they returned home the RV was in front of the house. None of the three defendants, including Alexander, produced the key to the RV and the officers were unable to find them.

Alma, Alexander, and Gustavo were later arrested and charged with conspiracy and aiding and abetting the knowing and intentional possession of a quantity of marijuana with intent to distribute. A jury found each defendant guilty on all counts.

## II

We review an appeal based on insufficiency of the evidence by viewing all of the evidence, and all reasonable inferences that may be drawn from the evidence, in the light most favorable to the verdict. *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998). After allowing for weighing of the evidence by the jury, "[i]f the evidence . . . gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, we must reverse the conviction . . . ." *Id.*

In order to prove conspiracy to possess and distribute drugs, the Government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons; (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the conspiracy. *United States v. Sacerio*, 952 F.2d 860, 863 (5th Cir. 1992). The evidence does not have to exclude every reasonable hypothesis of innocence or be wholly inconsistent with every

conclusion except guilt. *United States v. Pedroza*, 78 F.3d 179, 183 (5th Cir. 1996). Mere presence at the scene of a crime or close association with a co-conspirator will not support an inference of participation in a conspiracy. *United States v. Moreno,* 649 F.2d 309, 312 (5th Cir. 1981). However, an agreement may be inferred from a "concert of action," *United States v. Landry*, 903 F.2d 334, 338 (5th Cir. 1990), and presence "along with other evidence" can be relied on "to find conspiratorial activity by the defendant." *United States v. Cardenas*, 9 F.3d 1139, 1157 (5th Cir. 1993). Further "[t]he agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the 'development and collocation of circumstances.'" *United States v. Maltos*, 985 F.2d 743, 746 (5th Cir. 1992).

To prove that a defendant aided and abetted a criminal venture, the prosecution must show that the individual: (1) associated with the criminal enterprise; (2) participated in the venture; (3) sought by his action to make the venture succeed. *United States v. Montgomery*, 210 F.3d 446, 450 (5th Cir. 2000). "The evidence supporting a conspiracy conviction typically supports an aiding and abetting conviction." *Id.* Therefore we consider the sufficiency of the jury verdicts on both the conspiracy and aiding and abetting charges together.

We find there is sufficient evidence for the jury to have found beyond a reasonable doubt that Alma is guilty of conspiracy and aiding and abetting a criminal venture. Primo instructed Carillo to deliver the RV containing the marijuana to Alma. Alma not only claimed the RV, but procured the money necessary to pay for its transport to Dallas. Additionally she engaged in a "heat run" designed to counter-act potential law enforcement surveillance. *See Pedroza*, 78 F.3d at 183 (finding sufficient evidence of conspiracy when defendant's engaged in behavior designed to detect surveillance). Finally she affirmatively lied to the police about both her knowledge and possession

-6-

of the RV. An affirmative false explanation for defendant's behavior can be evidence of guilt. *Cf. United States v. Sutherland*, 428 F.2d 1152, 1157 (5th Cir. 1970) (finding a jury instruction that the jury may infer guilt from evidence of defendant's false affirmative alibi was proper); *see Ortega Reyna*, 148 F.3d at 544 (finding "implausible explanations" as evidence of "guilty knowledge" of vehicle containing hidden contraband). Accordingly a rational jury could have found beyond a reasonable doubt that Alma voluntarily participated in a conspiracy to possess and distribute marijuana and aided and abetted a criminal venture.

We find there is sufficient evidence for the jury to have found beyond a reasonable doubt that Gustavo is guilty of conspiracy and aiding and abetting a criminal venture. Gustavo traveled with De La Cruz, the person originally tasked with transporting the RV, to Pecos and ultimately to Dallas where they retrieved the RV. Gustavo twice acted as a lookout, first by himself when De La Cruz left to pick up Alma and Alexander, and then again with De La Cruz when Alma and Alexander left in search of money to pay Brookshire. This evidence coupled with Gustavo's affirmative false alibi given to the police provides sufficient evidence for a rational jury to find beyond a reasonable doubt that Gustavo voluntarily participated in a conspiracy to possess and distribute marijuana and aided and abetted a criminal enterprise. *See Dean*, 59 F.3d 1479, 1486 (5th Cir. 1995) (finding that evidence that defendant was a lookout coupled with other evidence suggesting guilt provide sufficient evidence of participation in a conspiracy); *see also Ortega Reyna*, 148 F.3d at 544 (finding "implausible explanation" is evidence of "guilty knowledge"); *cf. Sutherland*, 428 F.2d at 1157 (finding false alibi provides evidence of guilt). Accordingly a rational jury could have found beyond a reasonable doubt that Gustavo voluntarily participated in a conspiracy to possess and distribute marijuana and aided and abetted a criminal venture.

Similarly we find there is sufficient evidence for the jury to have found beyond a reasonable doubt that Alexander is guilty of conspiracy and aiding and abetting a criminal enterprise. Alexander accompanied Alma to the El Carnival parking lot to pick up the RV. He went with Alma to obtain money to pay Brookshire and tacitly participated in her deception in gathering those funds. Further he asked to take possession of the RV after payment was made and affirmatively did so. Additionally, when asked about the RV he affirmatively denied knowledge of it despite having paid for its tow to his home and having taken possession of the keys from the wrecker driver. He also did not provide the police with the keys to the RV despite being the last person to possess them.

Although no one of Alexander's acts taken alone demonstrates his knowledgeable and voluntary participation in the conspiracy or the criminal venture, his "concert of action" provides sufficient evidence of his guilt. *See Dean*, 59 F.3d at 1486 ("Acts which are not per se unlawful lose that character when cumulatively viewed as the constitutional elements of a conspiracy."). Alexander's active participation in the transport of the RV and payment for that transport coupled with both his direct association with the conspiratorial activities of Alma, Gustavo, and De La Cruz and his affirmative denial of knowledge of the RV provides evidence of more than mere association with criminal activity. *See Maltos*, 985 F.2d at 748 (requiring "some further circumstance" beyond mere association with criminal activity to "infer specific knowledge and willful participation"). Further his "implausible" denial of knowledge of the RV coupled with his "refusal" to answer questions or produce the keys to the RV evidences Alexander's "guilty knowledge" of the hidden contraband in the RV. *See Ortega Reyna*, 148 F.3d at 544 (finding "implausible explanation" and "refusal" to answer questions as evidence of "guilty knowledge"). There is no innocent explanation for both Alexander's efforts in transporting the RV to his home and his affirmative denial of

knowledge of the existence of the RV in the face of police inquiry. Therefore a rational jury could have found beyond a reasonable doubt that Alexander voluntarily participated in a conspiracy to possess and distribute marijuana and aided and abetted a criminal venture.

III

There is sufficient evidence to support each of the jury verdicts. Each conviction is AFFIRMED.