# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 12, 2011

No. 10-10419

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff – Appellee

v.

RENE SALAZAR

Defendant – Appellant

Appeal from the United States District Court
for the Northern District of Texas
Dallas Division
USDC No. 309-CR-00216-1

Before SMITH, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:[*]

On August 4, 2009, Rene Salazar ("Salazar") was indicted by a Texas grand jury on two counts of assault on a federal officer, in violation of 18 U.S.C. § 111, and one count of possession of a firearm during and in relation to a crime of violence, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii). Following a jury trial, Salazar was found guilty of all three counts. The district court sentenced Salazar to seventy-eight months on counts one and two. Based on United States

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-10419

Sentencing Guideline ("USSG") § 3A1.2, the district court enhanced Salazar's offense level by six levels, and sentenced Salazar to 162 months on count three to run consecutively to counts one and two. Salazar received a total sentence of 240 months imprisonment, three years supervised release and a $300.00 special assessment fee. Salazar now appeals his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

In the summer of 2009, local and federal law enforcement officers ("LEO") initiated Operation Community Shield in Dallas, Texas.[1] On June 24, 2009, at approximately 9:00 p.m., LEOs arrested a gang member near the corner of Grandview Avenue and Santa Fe Avenue in Dallas, Texas. After the suspect was arrested and taken away, four LEOs[2] remained at the scene to interview a witness. While Officer Schultz was interviewing the witness on the sidewalk, Agent Maldanodo was standing in front of his parked vehicle, Officer Loera was sitting in the driver's side of the marked Police cruiser and Agent Cavitt was standing outside the driver's side door talking with Officer Loera.

At approximately 9:45 p.m., Salazar drove past the LEOs and their two vehicles parked on the north side of the street. Salazar's vehicle passed so close to Maldanodo and Cavitt that, "[i]f [Maldanodo] wanted [he] could reach out and touch [Salazar's vehicle]." Salazar proceeded approximately twenty-five yards to the stop sign at Grandview Avenue and Santa Fe Avenue. Once stopped, Salazar stuck his arm out of the driver's side window and fired three shots from a .38 caliber revolver. Salazar then turned left onto Santa Fe Avenue as he fired two more shots and immediately sped away. Loera and Shultz quickly gave chase, and were able to find Salazar's car parked at his house. The officers

---

[1] In 2005, Immigration and Customs Enforcement ("ICE") began Operation Community Shield. Operation Community Shield was designed to dismantle violent street gangs.

[2] ICE Agent Steve Cavitt, ICE Agent Benito Maldanodo, Dallas Police Officer Darian Loera and Dallas Police Officer Teena Schultz remained at the scene of the arrest.

No. 10-10419

noticed Salazar running inside the house and ordered him to stop, but Salazar refused. The officers then followed Salazar into the house where they found him in the shower. After a brief scuffle, the officers arrested Salazar and took him to the police station.

Once at the station, Detective E. Ibarra read Salazar his *Miranda* rights and questioned him regarding the shooting. During the interrogation, Salazar admitted to firing the gun; not at the officers, but rather in the air to intimidate rival gang members that lived in the area. Salazar claimed that he did not know that LEOs were present at the intersection of Grandview Avenue and Santa Fe Avenue. He further stated that he fled the scene at a high rate of speed, went to his house, ran inside, hid the gun in the freezer, and jumped in the shower.[3]

On August 4, 2009, Salazar was indicted by a federal grand jury on two counts of assault on a federal officer,[4] in violation of 18 U.S.C. § 111, and one count of possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

Before trial, it was determined that defense counsel would be allowed ten peremptory strikes and the Government would be allowed six peremptory strikes. During the selection process, the district court asked potential jurors, "Have you, any member of your family or any close friend ever been employed by law enforcement personnel?" Several potential jurors raised their hand acknowledging that they had a connection with law enforcement. The

---

[3] Before trial, Salazar filed a motion to suppress the gun that the officers found in his freezer and his statement to the officers. The district court denied the motion. However, this ruling is not an issue in the current appeal.

[4] Counts one and two of the indictment charged Salazar with "knowingly, and by means and use of a dangerous weapon . . . did forcibly assault, resist, oppose, impede, intimidate, and interfere with [federal agents] who [were] engaged in . . .the performance of [] official duties." Count three stated that Salazar "knowingly used and carried a firearm during and in relation to a crime of violence . . . namely: assault on a Federal Officer as charged in Count One and Two."

No. 10-10419

Government used all six of its peremptory strikes against the first six jurors that did not have a connection to law enforcement. Of those jurors, two were African-American and one was Hispanic. Salazar objected to the Government's strikes, raising a *Batson*[5] challenge. Salazar claimed that jurors 2 and 3 were struck because they were the only African-Americans in the venire and juror 8 because he was Hispanic. Without making an on-the-record determination regarding whether Salazar had made a prima facie showing for a *Batson* challenge, the district court asked the Government for an explanation. The Government explained that "anybody that didn't have a family member in law enforcement was struck [with] the first six strikes . . . . We just used the first six strikes because of [no connection with] law enforcement." The district court accepted the Government's response and denied the challenge.

On December 22, 2009, Salazar filed a notice designating the witnesses that he may call at trial. Salazar designated Dr. Clarke Newman, an optometrist, as an expert witness to be called at trial. Salazar explained that Dr. Newman would testify to Salazar's vision impairments and his ability to identify objects in low light situations. At the pretrial conference, the district court asked defense counsel why Dr. Newman's testimony was relevant given the fact that the Government was not required to prove that Salazar had knowledge that the victims were federal agents. Defense counsel responded that Dr. Newman's testimony would "refute the [G]overnment's theory of the case that Mr. Salazar fired his weapon at the officers because he recognized them as officers." The district court took the issue under advisement before making a ruling.

In a pre-trial motion to the district court, defense counsel asked whether it would be allowed to call Dr. Newman as an expert witness. The district court

---

[5] *Batson v. Kentucky*, 476 U.S. 79 (1986) found that the use of peremptory challenges to strike potential jurors based on their race violates the Fifth Amendment's equal protection clause.

No. 10-10419

informed the parties that it was "leaning toward excluding testimony" that relates to whether Salazar could identify the LEOs as federal agents because it might cause juror confusion. The district court postponed its ruling to allow defense counsel to brief the issue. In support of its brief, Salazar proposed language for a jury instruction in an attempt to alleviate the possibility of juror confusion. After considering defense counsel's brief, the district court concluded that Dr. Newman would be allowed to testify that Salazar could not see anyone standing on the sidewalk or street that night, but would not allow any testimony as to whether Salazar could identify anyone as federal agents. At the conclusion of the Government's case-in-chief, defense counsel moved for a judgment of acquittal, which the court denied.

During Salazar's case-in-chief, defense counsel presented the testimony of Investigator Joe Saal and Dr. Newman. Investigator Saal testified that he had visited Washington Avenue and Santa Fe Avenue several months after the incident to take photographs and to videotape the darkness of the scene. Dr. Newman testified that Salazar was near-sighted, had astigmatism and corrective amblyopia. Dr. Newman opined that Salazar's "ability to see something if something were standing [on the sidewalk]" would be affected based on the dark conditions on the night of the shooting. In sum, Dr. Newman testified that the low light on the night of the shooting, the officer's dark uniforms and Salazar's poor eyesight combined to "make it practically impossible" for Salazar to see anyone in the area of the officers. After Dr. Newman's testimony, defense counsel rested its case-in-chief and moved for a judgment of acquittal. Salazar's motion for judgment of acquittal was denied.

Thereafter, the district court heard arguments from the parties regarding the jury instructions. Salazar was primarily concerned with the court's instruction that:

[i]t is not necessary to show that Defendant Salazar knew that the alleged victim was, at the time, a federal officer carrying out an official duty. So long as it is established beyond a reasonable doubt that the victim was, in fact, a federal officer acting in the performance of his official duties.

Salazar objected to the instruction, arguing that "we believe that the jury can consider" whether Salazar knew the people at the scene were LEOs "for the specific purpose of motive or lack of motive to assault these two [federal agents]." Salazar proposed that the district court instruct the jurors that:

you may consider evidence that the Defendant knew or did not know that the alleged victims in this case were law enforcement officials to determine whether the defendant had a motive to assault the victims and hence determine whether the Defendant intended to fire at them or place them in fear.

The Government opposed Salazar's proposed instruction, arguing that it is not required to prove whether Salazar knew or did not know of the victim's official status. Based upon its research, the district court explained that it had only seen Salazar's proposed instruction used where self-defense was at issue. Because this case did not involve the defense of self-defense, the district court overruled Salazar's objection to the Government's proposed instruction and instructed the jury on the relevant law.

On January 14, 2010, the jury returned a verdict of guilty on all three counts. The district court dismissed the jury and sat in recess until sentencing. Prior to sentencing, probation prepared a pre-sentence report ("PSR"), which calculated Salazar's offense level to be twenty-six with a criminal history category I. At sentencing, defense counsel raised several objections to the PSR, but primarily concerned itself with the six level enhancement under U.S.S.G. § 3A1.2. Defense counsel argued that the enhancement should not apply because the Government did not prove, by a preponderance of the evidence, that Salazar

No. 10-10419

knew that the people in the area at the time of the shooting were federal officers. The district court disagreed and applied the enhancement.

Subsequently, the district court adopted the PSR and PSR Addendum and sentenced Salazar to 78 months imprisonment for counts one and two. On count three, the district court sentenced Salazar to serve 162 months imprisonment which incorporated a forty-two month enhancement.

After sentencing Salazar to a total of 240 months in prison, the district court provided its reasons for the upward variance, which it stated:

> Mr. Salazar, what you did was simply wrong. And I don't think a guidelines sentence of 198 months adequately addresses the severity of your conduct. Let me put everything in perspective. What you did on that night, you fired shots. And I am convinced that you knew that there were law enforcement officers on the scene. I am convinced that you saw Officer Maldanodo. I am convinced that you saw other officers.
>
> I do not buy your story that you did not see those officers. It does not square with the evidence. Now, there w[ere] some initial shots fired. That in itself is bad enough. But for whatever reason, that was not enough reason for you. A few seconds passed. When you stopped as you are turn[ing], more shots were fired. That was a conscious decision on your part. That was no mistake. That you did, you intended to do. There is no ifs, ands, or buts, about it. If you are going to fire at law enforcement officers, that has consequences and it needs to have severe consequences so that the public and others who may – others who might be inclined to commit these types of offenses know that the Court does not take commission of such offenses lightly. In other words, a sentence needs to be sufficient to deter conduct that others might be inclined to engage in. That is one reason why I am going outside the guidelines.
>
> I do not think a sentence of 16 and a half years or 198 months for these three offenses is sufficient to accomplish that objective of the statute. Also, I don't think that it shows adequate respect for the law, that is, a sentence of 16 and a half years. It does not reflect the seriousness of the offense.

No. 10-10419

The district court, in accordance with the statute, ordered that the sentence for count three run consecutively with counts one and two. Salazar timely appealed.

## DISCUSSION

On appeal, Salazar raises several issues. Specifically, Salazar claims that the district court erred (1) in concluding that Salazar failed to make a prima facie case of discrimination under *Batson*; (2) when it refused to allow Dr. Newman to testify whether Salazar could have identified the people at the scene that night as LEOs; (3) when it refused Salazar's proposed jury instruction regarding whether Salazar knew the people at the scene were LEOs; and (4) when it applied USSG § 3A1.2, determining that Salazar intentionally targeted the LEOs because of their status as LEOs.

I.     *Whether the district court erred in overruling Salazar's objection under Batson v. Kentucky.*

In this case, Salazar contends that the district court erred in concluding that he failed to make out a prima facie case of discrimination under *Batson*. Salazar argues that he satisfies the first prong as long as he establishes an inference of discrimination. *See Johnson v. California*, 545 U.S. 162, 173 (2005). "*Batson* intended for a prima facie case to be simple and without frills." *Cain v. Price*, 560 F.3d 284, 287 (5th Cir. 2009). It is sufficient "to show only that the facts and circumstances of [the defendant's] case gave rise to an inference that the [Government] exercised peremptory challenges on the basis of race." *Id.* Salazar further claims that the court "should have proceeded to the second and third steps of the *Batson* inquiry, but it did not. This was reversible error."

"The use of peremptory challenges to strike venire-persons based on their race violates the equal protection component of the Due Process clause of the Fifth Amendment." *United States v. Montgomery*, 210 F.3d 446, 453 (5th Cir. 2000). The district court's conclusion as to whether the peremptory challenges

8

were racially motivated is reviewed for clear error. *United States v. Williams*, 264 F.3d 561, 571 (5th Cir. 2001). This court, however, "give[s] great deference to the district court because 'findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the [peremptory] challenge.'" *United States v. Davis*, 393 F.3d 540, 544 (5th Cir. 2004) (quoting *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993)). This court analyzes whether a party has exercised a peremptory strike in a discriminatory manner in three steps:

> First, the claimant must make a *prima facie* showing that the peremptory challenges have been exercised on the basis of race. Second, if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate race-neutral explanations for the peremptory challenges. Finally, the trial court must determine whether the claimant has carried his burden of proving purposeful discrimination.

*Bently-Smith*, 2 F.3d at 1373.

Salazar relies on *Johnson* wherein the Supreme Court reversed the trial court based on *Batson* because the prosecution in that case used three of its twelve strikes to eliminate all three African-American jurors left in the venire after preliminary disqualifications. 545 U.S. at 164. Salazar's reliance on *Johnson*, however, is misleading because it differs from the present case. In *Johnson*, defense counsel raised the *Batson* challenge twice. *Id.* at 165-167. Defense counsel raised its first *Batson* objection when the prosecution struck the second African-American. *Johnson*, 545 U.S. at 165-167. Without requiring a race-neutral reason for the strike from the prosecution, the trial court overruled Johnson's *Batson* objection. *Id.* Johnson's defense counsel renewed its *Batson* objection the next morning. *Id.* The trial court again overruled the objection without a race neutral explanation from the prosecution. *Id.*

Unlike *Johnson*, the district court in the present case asked the Government to provide a race-neutral explanation as to why it struck the

particular jurors after Salazar had raised his *Batson* challenge. The Government explained that "anybody that didn't have a family member in law enforcement was struck [with] the first six strikes . . . . We just used the first six strikes because of [no connection with] law enforcement." Subsequently, the district court overruled Salazar's *Batson* challenge stating that Salazar did not make out a prima facie showing.

Based on the record before us, it is clear that the district court did not err in overruling Salazar's *Batson* challenge. The district court heard Salazar's initial challenge to the Government's strikes, the Government provided a race-neutral reason for its use of the peremptory strikes, and the district court determined that Salazar did not prove purposeful discrimination by the Government. Therefore, in light of the district court's unique position to assess the Government's credibility, we cannot find clear error in the district court's decision to overrule Salazar's *Batson* challenge.

II.     *Whether the district court erred when it refused to allow Dr. Newman to testify whether Salazar could have identified the people at the scene that night as LEOs.*

This court reviews a district court's evidentiary rulings for an abuse of discretion, subject to the harmless error doctrine. *United States v. Sanders*, 343 F.3d 511, 517 (5th Cir. 2003). In order for the error to be reversible, it must prejudicially affect a substantial right of the defendant. *Id.* at 519. In *United States v. Feola*, the Supreme Court held that 18 U.S.C. § 111 did not require proof that the defendant knew the victim was a federal officer. 420 U.S. 671, 684 (1975).

Here, Salazar argues that the district court erred by "improperly restricting Mr. Salazar's right to present a defense against the [G]overnment's allegations." Salazar's assignment of error stems from the district court's ruling that defense expert, Dr. Newman, could only testify to whether Salazar's vision

would allow him to see anyone standing on the sidewalk or street that night, but would not allow any testimony as to whether Salazar could identify anyone as federal agents. The district court stated that it would not allow Dr. Newman to testify to whether Salazar could identify anyone as federal agents out of concern that jurors may become confused because whether or not Salazar could identify the people at the scene as LEOs is not an element of the underlying crimes and would cause jury confusion.

Examining the plain language of the statute, the Government is required to prove that the defendant "forcibly assault[ed] . . . [or] intimidat[ed]" a federal officer. *See* 18 U.S.C. § 111. The defendant need not know whether the victim was a federal agent to be convicted pursuant to 18 U.S.C. § 111. *Feola*, 420 U.S. at 677-678. All that is required then is that the defendant knowingly assaulted a person who was a LEO acting in his official capacity. *Id.* Federal Rule of Evidence 402 provides that "[e]vidence which is not relevant is not admissible." *See* Fed. R. Evid. 402. Indeed, even if the evidence was relevant, the district court may properly exclude the evidence if the "probative value is substantially outweighed by the danger of . . . confusion of the issues, misleading the jury . . . ." *See* Fed. R. Evid. 403.

Salazar argues that the evidence would tend to show that the victims's status as LEOs did not motivate the shooting. Here, Salazar's argument fails because motive is not an element of the underlying offense. Thus, whether or not the defendant knew the victim to be a federal agent is irrelevant and therefore not admissible.

Salazar further claims that Dr. Newman's testimony was erroneously limited because Dr. Newman was going to testify that Salazar's vision was so poor it would be highly unlikely for Salazar to have identified the LEOs as LEOs. Thus, Salazar's argument goes: If Salazar could not have identified the LEOs as LEOs then he certainly could not have intended or been motivated to

shoot at the LEOs because they were LEOs.  Again, all that is required is that the Government establish that Salazar forcibly assaulted a person who was a federal officer. *Feola*, 420 U.S. at 677-678.

Moreover, despite the district court's limitation on Dr. Newman's testimony, Dr. Newman gave testimony regarding Salazar's impaired vision. When Dr. Newman was presented with a photograph of Maldanodo standing between the LEOs's vehicles, defense counsel asked the likelihood that Salazar, even wearing eyeglasses, could see [Maldanodo] standing there.  Dr. Newman replied that it would be possible, but unlikely, for Salazar to see Maldanodo standing between the two vehicles.  Defense counsel also asked Dr. Newman whether Salazar, under the same conditions, would be able to make out the yellow lettering on Maldanodo's shirt, which read "POLICE."  He stated that it would be impossible for Salazar to make out the yellow word "POLICE."

Similarly, Dr. Newman was also presented with a photograph of Cavitt, which was taken on the night of the shooting.  Dr. Newman was allowed to testify that it would be "close to impossible" for Salazar to see Cavitt standing on the sidewalk.  Dr. Newman testified that Salazar's near-sightedness, his astigmatism, his amblyopia condition and the poor lighting amalgamated to make it "practically impossible" for Salazar to identify who, if anyone, was standing on the sidewalk or in the street.

Therefore, the district court's limitation on Dr. Newman's testimony was slight.  Accordingly, the district court did not abuse its discretion in limiting Dr. Newman's testimony.

III.   *Whether the district court erred when it refused Salazar's proposed jury instruction regarding whether Salazar knew the people at the scene were LEOs.*[6]

---

[6] This assignment of error falls under a similar vein of analysis as the issue discussed above.

No. 10-10419

The district court's denial of a proposed jury instruction is reviewed under an abuse of discretion standard. *United States v. Betancourt*, 586 F.3d 303, 305 (5th Cir. 2009). However, the district court abused its discretion in denying the defendant's proposed jury instruction, we must apply a harmless error analysis. *Id.* The district court will not abuse its discretion in denying a requested jury instruction unless the instruction,

> (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.

*United States v. Jobe*, 101 F.3d 1046, 1059 (5th Cir. 1996) (quoting *United States v. Smithson*, 49 F.3d 138, 142 (5th Cir. 1995) (internal quotation marks omitted)). The district court, however, retains substantial latitude in constructing its jury charge." *United States v. Edelkind*, 525 F.3d 388, 397 (5th Cir. 2008*).*

> Salazar's proposed jury instruction provided that the jury:

> may consider evidence that the Defendant knew or did not know that the alleged victims in this case were law enforcement officials to determine whether the defendant had a motive to assault the victims and hence determine whether the Defendant intended to fire at them or place them in fear.

Salazar contends that this proffered instruction should have been submitted to the jury because it would have allowed him to rebut the Government's case to show that he did not intend to fire a gun at the LEOs. The district court noted that it could only find one case where such an instruction was warranted. *See United States v. Moore*, 958 F.2d 646, 649-50 (5th Cir. 1992). The court noted that in that case, the proffered instruction was allowed based on the defendant's theory that he acted in self-defense when he assaulted the

13

No. 10-10419

federal agents.  The district court found that Salazar had not claimed self-defense, and therefore denied the instruction.

The Government argues that Salazar's proffered instruction fails under the first step of the *Jobe* test – instruction must be a "substantially correct statement of the law." *Jobe*, 101 F.3d at 1059.  The Government claims that the instruction assumes that Salazar saw someone at the scene, but he may not have been able to determine that the person was a federal agent.  *Feola* makes clear, however, that the defendant need not know that the victim was a federal agent so long as the defendant intentionally assaulted the victim and that victim was a federal agent. 420 U.S. at 477-478.  An instruction, such as Salazar's, is appropriate "only when self-defense, or other justifiable action, is raised by the evidence." *Feola*, 420 U.S. at 677-678; *see also* Fifth Cir. Pattern Jury Instr. 2.09 (instructing that defendant would not be guilty of assault if evidence creates reasonable doubt concerning whether defendant knew victim to be federal officer and only committed such act because of reasonable, good faith belief that defendant needed to defend himself against assault by private citizen).  Further, instructing the jurors that the Government is not required to prove that Salazar knew the victims were federal agents, and subsequently instructing that they may consider evidence of whether or not Salazar could identify the people at the scene as federal agents would likely confuse the jurors.

In this case, Salazar has not claimed that he was acting in self-defense or justified in his actions.  Whether or not Salazar intended to shoot specifically at federal officers is irrelevant under the statute. *Feola*, 420 U.S. at 477-478.  To be found guilty, the Government need only prove that Salazar intended to assault the victims and that the victims were federal agents. *Id.*  An instruction allowing the jury to consider irrelevant evidence will, as the district court found, likely cause juror confusion.  Therefore, the district court did not abuse its discretion in denying Salazar's proffered jury instruction.

*IV.    Whether the district court clearly erred when it applied U.S.S.G. § 3A1.2, determining that Salazar intentionally targeted the LEOs because of their status as LEOs .*

Salazar alleges that the district court erred at sentencing when it determined that he intentionally targeted the LEOs because of their status as LEOs and enhanced his base offense level under U.S.S.G. § 3A1.2.  For the district court to apply a sentencing enhancement, the Government must prove by a preponderance of the evidence that the enhancement applies. *United States v. Le*, 512 F.3d 128, 136 (5th Cir. 2007).  "This court reviews de novo the district court's guidelines interpretations and reviews for clear error the district court's findings of fact." *Id.* at 134.  "A factual finding is not clearly erroneous 'as long as it is plausible in light of the record as a whole.'" *United States v. Gonzales*, 436 F.3d 560, 584 (5th Cir. 2006) (quoting *United States v. Holmes*, 406 F.3d 337, 363 (5th Cir. 2005)).

The United States Sentencing Guidelines provide a six level enhancement to a defendant's base offense level where the victim of the assault was a Government officer, the assault was motivated by the victim's status as a LEO, and the applicable guideline is for an offense against the person.  *See* U.S.S.G. § 3A1.2(a) & (b) (2010).  Salazar argues that this enhancement should not apply because he did not know the people standing on the sidewalk and street were LEOs and therefore he could not have been motivated by the LEOs's status in committing the offense.  We disagree.

Despite Salazar's contention that he did not know that the people on the side of the street were LEOs, there was sufficient testimony at trial to support the opposite conclusion.  Maldanodo testified that Salazar drove within five feet of where he was standing, that he could have reached out and touched Salazar's vehicle.  Maldanodo further testified that Salazar passed even closer to Cavitt, who was standing in the street.  The evidence also established that the LEOs

were standing near a marked police vehicle with the interior dome light on. Salazar, however, maintains that the assault could not have been motivated by the victims's status as LEOs because his vision was so poor that he could not identify the victims as LEOs.

The district court did not commit clear error when it found that Salazar was motivated by the LEOs status to fire his weapon and applied § 3A1.2 of the Sentencing Guidelines. In fact, the district court was "convinced that [Salazar] knew that there were law enforcement officers on the scene." While Salazar claims that his vision was so poor that he could not see the four LEOs, the evidence showed that after the shots were fired Salazar was able to speed away through poorly lit streets to his house with his headlights off. Considering that evidence and Salazar's own expert's testimony that if Salazar was not wearing his glasses when he sped away it would have been a miracle that he did not wreck his vehicle, the district court found it plausible that Salazar was wearing his eyeglasses. In light of the record as a whole, the district court correctly found it plausible that Salazar saw the LEOs and was motivated by their presence to fire the five shots. Therefore, the district court did not commit clear error when it found that the six-level sentencing enhancement applied.

## CONCLUSION

Based on the foregoing reasons, we AFFIRM Salazar's conviction and sentence.

16