IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-40142
_____

UNITED STATES,

                                        Plaintiff-Appellee,

                        versus

JESUS ORTEGA REYNA,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

July 28, 1998

Before JOLLY, WIENER, and STEWART, Circuit Judges.

PER CURIAM:

Defendant-Appellant Jesus Ortega Reyna ("Ortega") was convicted by a jury on charges of possession with intent to distribute over 400 grams of heroin and 7,000 grams of amphetamines, in violation of 21 U.S.C. § 841 (a)(1). On appeal, Ortega argues that the district court erred in denying his motion for acquittal, asserting that Plaintiff-Appellee the United States ("the government") failed to produce sufficient evidence that his possession of the illegal drugs was "knowing." After thoroughly reviewing the record, the arguments of counsel, and the applicable law, we agree that no reasonable jury could have concluded beyond a reasonable doubt that Ortega's possession of the drugs was knowing. Accordingly, we reverse his conviction.

I

FACTS AND PROCEEDINGS

Accompanied by his wife and two children, Ortega, who is a native of Mexico and resident alien of the United States, was driving a pickup truck north from the Mexican border when he came to and entered the Border Patrol checkpoint at Falfurrias, Texas. Border Patrol Agent Oziel Puente noticed that the truck was "leaning to one side," and that the right rear tire was larger than the rest. When Puente asked Ortega if he was aware of the truck's condition, Ortega responded that the truck was not his, but belonged to a friend in Roma, Texas. According to Puente, he was told by Ortega that he and his family were going to El Campo, Texas.

While the truck remained at the primary checkpoint, Puente inspected its undercarriage and noticed several balancing weights on the right rear tire, indicating to him that the tire might contain hidden compartments for the transport of drugs. After obtaining Ortega's consent to search the vehicle further, Puente had Ortega move the truck to a secondary inspection area. There Puente released air from the tire but was not able to detect any odor of marijuana.

Agent Armando Diaz, a K-9 handler, arrived to assist in the search. When his drug-sniffing dog alerted the agents to the larger tire, they cut it open and discovered over sixteen pounds of amphetamines and fourteen ounces of heroin. Puente testified that Ortega did not appear to be nervous, and Diaz confirmed that Ortega "didn't appear to be very interested" in the search. Shortly

2

thereafter, Puente took Ortega inside and advised him of his rights.[1]  Puente then showed him one of the bundles found in the tire and asked "if he had any knowledge of it."  Puente states that Ortega glanced down, paused for "around 15 seconds," repeated that the car was not his, and responded that he "had no knowledge" of the presence of the drugs.

Some time later, Elizabeth Gonzales, an officer with the Corpus Christi Police Department and a member of the DEA Task Force, interviewed Ortega in more detail and also spoke with his wife and older son.  According to Gonzales, Ortega told her that "he was from Houston and he had been in the Valley area because his father had been sick so he had to go to Monterrey to see his father."  Gonzales also recalled Ortega's stating that he "had been in the Valley area for about a month and while he was in Miguel Aleman, which is a small town across [the border] from Roma, [Texas] that his truck had broken down so he had borrowed this truck to come home in."  Ortega indicated to Gonzales that he was returning to Houston to enroll his children in school.  He initially gave the name of the friend from whom he had borrowed the truck as simply "Jesus," later providing the last name "Barrera" and ultimately giving the full name as "Jesus Aleman Barrera."

Gonzales asked Ortega how he was going to return the truck to

---

[1]The record shows that Puente read Ortega his rights in Spanish but does not reflect whether the rest of Puente's questioning of Ortega was in Spanish or English.  The record does show that Ortega neither reads nor writes either English or Spanish, but is not clear whether he speaks any English at all. The record does show that Ortega used an interpreter at trial.

3

Barrerra. Ortega answered that Barrerra was planning to retrieve the truck in Houston. When Gonzales inquired as to whether Barrerra knew where in Houston Ortega lived, he said that he did not know whether Barrerra had this information. At trial, however, Ortega explained that although he did not know if Barrerra knew precisely where to find him in Houston, he assumed that Barrerra would locate him through Barrerra's mother-in-law, who also lives in Houston and knows Ortega's sister, with whom he would be staying while in Houston. In addition, Ortega acknowledged that he did not have an address or telephone number for Barrerra. He further testified, however, that Barrerra lived in the same neighborhood in Miguel Aleman where Ortega sometimes stays with his family, and that, even though the houses do not have street numbers, he knew where to find Barrerra's house and could communicate those directions to others.

At the time of his arrest, Ortega was carrying $731 in cash. When Gonzales asked him if "he had been working," Ortega responded that he "had done some odd jobs"; but Gonzales failed to ask him where or for whom. At trial, Ortega explained that the $731 was all that remained of approximately $1500 that he had received as a tax refund, and produced a copy of his tax return, which substantiated this statement.

During her interrogation, Gonzales failed to ask Ortega whether he had any luggage with him, but she and the other agents testified at trial that they did not recall seeing any with Ortega or in the vehicle. Although each officer testified that someone

4

with the border patrol always conducts a thorough, written inventory of any vehicle stopped for a drug violation, the government failed to introduce a copy of an inventory of the truck Ortega had driven. In contrast to this testimony of customary checkpoint procedure and the absence of physical evidence of such an inventory, both Ortega and his wife testified unequivocally that they had a large suitcase with them in the truck.

Ortega was indicted on charges of possession with intent to distribute over 400 grams of heroin (count one) and over 7,000 grams of amphetamines (count two), in violation of 21 U.S.C. § 841 (a)(1). After a two-day trial —— and three days of deliberation —— a jury found Ortega guilty of both counts. The district court sentenced him to 130 months in the custody of the Bureau of Prisons and a four-year term of supervised release. Ortega timely appealed.

II

ANALYSIS

A.  Standard of Review

As Ortega moved for a judgment of acquittal at the close of all the evidence, we must determine whether any reasonable trier of fact could have found that the evidence established the essential elements of the crime beyond a reasonable doubt.[2] We consider the evidence in the light most favorable to the government, drawing "all reasonable inferences and credibility choices made in support

---

[2]United States v. Alix, 86 F.3d 429, 435 (5th Cir. 1996).

5

of the verdict."[3]  "The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence."[4]  If the evidence tends to give "equal or nearly equal circumstantial support" to guilt and to innocence, however, reversal is required:  When the evidence is essentially in balance, "'a reasonable jury must necessarily entertain a reasonable doubt.'"[5]

B.  <u>Applicable Law</u>

To prove Ortega's guilt of the charged offense in this case, the government was required to prove three elements beyond a reasonable doubt:  (1) knowing (2) possession of the drugs in question (3) with intent to distribute them.[6]  Only the first element — knowledge — is at issue in this appeal, i.e., whether the evidence is sufficient to satisfy the scienter element beyond a reasonable doubt.

As a general rule, a jury may infer knowledge of the presence of drugs from the exercise of control of a vehicle containing such

---

[3]<u>United States v. Ivy</u>, 973 F.2d 1184, 1188 (5th Cir. 1992), <u>cert. denied</u>, 507 U.S. 1022 (1993).

[4]<u>United States v. Lopez</u>, 74 F.3d 575, 577 (5th Cir.), <u>cert. denied</u>, 517 U.S. 1228 (1996).

[5]<u>Id.</u> (quoting <u>United States v. Sanchez</u>, 961 F.2d 1169, 1173 (5th Cir.), <u>cert. denied</u>, 506 U.S. 918 (1992) (emphasis omitted)).

[6]<u>United States v. Resio-Trejo</u>, 45 F.3d 907, 911 (5th Cir. 1995); <u>United States v. Diaz-Carreon</u>, 915 F.2d 951, 953 (5th Cir. 1990).

contraband.[7] When the drugs are secreted in hidden compartments, however, "this Court has normally required additional 'circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge.'"[8] This requirement stems from our recognition that, in hidden compartment cases, there "is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise."[9] This assumption is heightened when, as here, the vehicle is a "loaner" or has otherwise been in the possession of the suspect for only a short time.[10]

Among the types of behavior that we have previously recognized as circumstantial evidence of guilty knowledge are: (1) nervousness;[11] (2) absence of nervousness, i.e., a cool and calm demeanor;[12] (3) failure to make eye contact;[13] (4) refusal or

_____

[7]Resio-Trejo, 45 F.3d at 911.

[8]Id. (quoting United States v. Anchondo-Sandoval, 910 F.2d 1234, 1236 (5th Cir. 1990)).

[9]Diaz-Carreon, 915 F.2d at 954.

[10]During his interview with Gonzales, Ortega explained that after he borrowed the truck from Barrerra but before he left for Houston, Barrerra and another person told him they needed to use the truck briefly. They took the truck and returned it shortly, in time for the Ortegas to leave, as scheduled, a few hours later.

[11]See, e.g., United States v. Crooks, 83 F.3d 103, 107 (5th Cir. 1996); United States v. Casilla, 20 F.3d 600, 607 (5th Cir. 1994), cert. denied by 513 U.S. 892 (1994) and 513 U.S. 899 (1994) and 513 U.S. 949 (1994); Diaz-Carreon, 915 F.2d at 954; United States v. Richardson, 848 F.2d 509, 513 (5th Cir. 1988).

[12]See, e.g., Resio-Trejo, 45 F.3d at 913 (relying on Resio's "calm demeanor and indifference while the agents dismantled the gas

7

reluctance to answer questions;[14] (5) lack of surprise when contraband is discovered;[15] (6) inconsistent statements;[16] (7) implausible explanations;[17] (8) possession of large amounts of cash;[18] and (9) obvious or remarkable alterations to the vehicle, especially when the defendant had been in possession of the vehicle

---

tanks on his truck" as circumstantial evidence of guilt).

[13]See, e.g., United States v. Price, 869 F.2d 801, 803 (5th Cir. 1989).

[14]See, e.g., id.; United States v. Muniz-Ortega, 858 F.2d 258, 259 (5th Cir. 1988) ("Appellant was . . . hesitant to answer questions.").

[15]See, e.g., Price, 869 F.2d at 803; United States v. Romero-Ortega, 867 F.2d 834, 836 (5th Cir. 1989).

[16]See, e.g., Casilla, 20 F.3d at 606 (stating that defendant's "trial testimony was also inconsistent with the varying stories that he had earlier told the customs agents, which were in turn contradicted by the physical evidence"); Diaz-Carreon, 915 F.2d at 955 (noting that defendant gave agents contradictory statements regarding his destination and place of residence); Anchondo-Sandoval, 910 F.2d at 1237 (pointing out that defendant made inconsistent statements to the customs and DEA agents concerning "his motivations for traveling and his intended destinations").

[17]See, e.g., Casilla, 20 F.3d at 606 ("Casilla offered an implausible explanation that he was hired as a chauffeur who lacked a driver's license for a trip to California by way of Texas, Mexico, and Guatemala."); Diaz-Carreon, 915 F.2d at 955 (finding implausible defendant's story that a man named Ruben, whom defendant had know only for a couple of days, had loaned him a truck so he could find employment, as defendant did not know where Ruben lived or where he would retrieve the truck); Richardson, 848 F.2d at 513 (finding "inherent implausibility in [defendant]'s flying to Los Angeles to see his sick mother without enough money to return, and then leaving at two o'clock the next morning in a mysterious rent car," which was left by a mysterious benefactor "without any announcement whatever except dropping the ignition key through the mail slot").

[18]See, e.g., Crooks, 83 F.3d at 107.

for a substantial period of time.[19]

C.    Evidence of Mens Rea

To prove the requisite scienter, the government relies on the following circumstantial evidence, which it maintains is "suspicious in nature and demonstrates guilty knowledge": (1) Ortega's non-verbal behavior at the checkpoint, including the absence of nervousness and his momentary delay and downward glance when, immediately after hearing the Miranda warning, he was asked the "$64,000 question" about his awareness of the presence of contraband; (2) his statements regarding the origin and destination of his trip, which the government characterizes as inconsistent; (3) the absence of luggage; (4) his possession of over $700 in cash; and (5) the condition of the truck.  When we review the sufficiency of circumstantial evidence to prove mens rea beyond a reasonable doubt, we must examine the defendant's behavior from his perspective, here an illiterate, poverty-level Mexican national who performs odd jobs in this country for a living, and who is traveling through a part of Texas where immigration and drug enforcement personnel are numerous and properly suspicious of

---

[19]See, e.g., Resio-Trejo, 45 F.3d at 913 ("The evidence of the recent alterations and the fresh marihuana, considered together with the evidence of Resio's possession and control of the truck in the ten months preceding his arrest . . . provide a sufficient basis for the inference that Resio knew the marihuana was concealed in his truck."); see also United States v. Inocencio, 40 F.3d 716, 724 (5th Cir. 1994) (noting that "the bed of the vehicle was higher than normal" and finding suspicious the "discovery of fresh paint (on a brand new truck)"); Anchondo-Sandoval, 910 F.2d at 1235 (noting that defendant's "vehicle, a 1978 Thunderbird bearing expired Arizona plates, 'met a good profile' for closer scrutiny because it was in poor condition and thus could readily be junked").

person's meeting Ortega's profile.  We remain mindful as well that in Ortega's native culture, where there is no Fourth Amendment, relatively minor abuses of power by the authorities are not unexpected and are best accepted without protest.

After examining each piece of evidence from that perspective, we conclude that, like Newton's Third Law, for every inference of guilt that may be drawn from the evidence, there is an equal and opposite benign inference to be drawn.  This in turn places the evidence in equipoise and thus makes it incapable, as a matter of law, of serving as the basis of a jury finding that Ortega's possession of illicit drugs was "knowing" beyond a reasonable doubt.

### i. Non-verbal Responses

We consider first the evidence of Ortega's non-verbal behavior at the scene of the search from which the government argues that a jury could have inferred the existence of guilty knowledge.  For openers, the government would have us infer guilt from Ortega's lack of nervousness; in contrast, Ortega would have us draw a contrary inference.  We have ourselves allowed that an inference of guilty knowledge may be drawn from the presence, as well as from the absence, of nervousness.[20]  Evidence of Ortega's composure thus provides equal circumstantial support for a finding of either guilt or innocence.

Then there is Ortega's failure to object or appear concerned when the agents started slicing open the oversized tire.  Again, we

---

[20]See supra notes 10 and 11 and accompanying text.

are unconvinced.  We speculate that, had Ortega vehemently objected to the agents' actions, the government would have argued that Ortega's behavior justified an inference of guilty knowledge with respect to the contents of the tire.  Similar to the evidence of Ortega's maintained calm, the inferences to be drawn from his failure to protest the destruction of the tire are twofold--an inference of guilt and an inference of innocence--and they are nearly equally balanced.

The government also emphasizes that when asked whether he was aware of the presence of the drugs, Ortega hesitated ⸺ for an estimated fifteen seconds ⸺ before answering that the truck did not belong to him.  Such a momentary delay is truly indicative of nothing in this context.  Ortega's single hesitation and downward glance fall well short of the generalized hesitancy to answer questions or delayed responses that we accepted as circumstantial evidence of guilty knowledge in such cases as Muniz-Ortega.[21]  The government nevertheless proffers the inference that Ortega was stalling while he confected an answer to cover his guilt.  But an equally plausible inference is that an innocent person, astonished by the agents' discovery of hidden contraband in his vehicle and confronted with such a question, would take a few seconds to calm his nerves and formulate his answer, lest he inadvertently trip over some inculpatory nuance.

We do not take lightly the limitations of our review in that we must consider the evidence in the light most favorable to the

---

[21]See 858 F.2d at 259.

11

government; still, we conclude that all of Ortega's non-verbal behavior at the border patrol checkpoint was at least as consistent with innocence as with guilt. Indeed, both a drug "mule" and an innocent resident alien might well behave as Ortega did, both before and after the discovery of contraband in a hidden compartment of a borrowed vehicle.

ii. <u>Verbal Responses</u>

The government also points to those of Ortega's oral responses that it views as inconsistent and thus as circumstantial evidence of guilty knowledge. For instance, Ortega told Puente that he was traveling to El Campo, but told Gonzales that he was on his way to Houston. Given Ortega's plausible explanation at trial, however, these statements are not necessarily inconsistent. Ortega testified that he planned to stop in El Campo, which is directly on the way from Roma to Houston, to pick up barbecue "disks," and then to continue on to Houston to enroll his children in school. Similarly, while Ortega was telling the agents that he and his family were coming from Miguel Aleman, Mrs. Ortega was telling them that the family was on its way from Roma, Texas. Again, as with the purported inconsistency in their destination, any perceived inconsistency in the Ortegas' statements about their point of departure evaporates when it is recognized that Miguel Aleman, Mexico, and Roma, Texas, are simply sister cities on opposite sides of the Rio Grande River —— two municipalities comprising a single metropolitan area, which is separated by but one natural and one artificial boundary. The most direct route north from Miguel

12

Aleman is across the international bridge to and through Roma, and from there to the checkpoint.[22]

  iii. <u>Luggage</u>

  The government next argues that if Ortega had been in Mexico for an extended family visit and was returning to Houston to put his children in school —— as he contends —— rather than on a drug run, he would have had luggage with him.  As noted, each of the government's agents testified that they did not recall seeing luggage either in Ortega's possession or in the truck itself.  Each also testified, however, that he was not charged with taking an official inventory.  Furthermore, even though the agents asserted that standard procedure would call for the taking of a full, written inventory of the borrowed vehicle at the checkpoint, the government —— curiously —— chose not to produce such a writing at trial, thus failing to adduce affirmative documentary evidence that the Ortegas did not have luggage and thereby settle this contested fact.[23]  For their part, both Mr. and Mrs. Ortega stated

---

[22]<u>Compare</u> <u>Diaz-Carreon</u>, 915 F.2d at 955.  In that case, we determined that the defendant had told inconsistent stories because "Diaz-Carreon first told customs officials that he was traveling to Canutillo, Texas, and later told [them] that he was traveling to Anthony, New Mexico," a town about six or seven miles from Canutillo and a straight shot along Interstate 10.  The facts in <u>Diaz-Carreon</u> are distinguishable from those in this case, however, as the court found additional support for a finding of guilty knowledge in the defendant's nervous behavior at the stop ("[B]efore being told that the agents had discovered marijuana in the pickup truck, Diaz-Carreon volunteered, 'If the truck is loaded, I didn't know about it.'") and in his implausible story about being loaned a truck by a man he met only a few days earlier and known only as "Ruben."  <u>Id.</u> at 954-55 (emphasis omitted).

[23]<u>See</u> <u>Herbert v. Wal-Mart Stores, Inc.</u>, 911 F.2d 1044, 1046 (5th Cir. 1990) (citing 2 Wigmore on Evidence § 285, at 192

13

unconditionally that they were carrying a large suitcase in the truck. But even if we assume arguendo that the jury exercised its credibility prerogative and chose to believe the agents rather than the Ortegas on the luggage question, the mere absence of luggage would not make the explanation of a month-long family visit "implausible," given Ortega's uncontradicted testimony that (1) he had a house in Miguel Aleman, (2) he lived semi-permanently with his sister in Houston, and (3) his children had clothes there.

    iv.  <u>Possession of Funds</u>

Then there is Ortega's possession of over $700 in cash at the time of his arrest. We remain mindful, of course, of our prior pronouncements to the effect that possession of large amounts of cash may be circumstantial evidence of guilt. Considering Ortega's possession of the cash and his description of his employment, a jury might well question his ability to accumulate this much cash while supporting his family with odd jobs. In the context of this case, however, the government's contention that the $731 is circumstantial evidence that Ortega was participating in a drug run is contradicted by his explanation, fully documented, that the

---

(Chadbourn ed. 1970):

> The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would thereby be elucidated, serves to indicate, as the most natural inference, that the party fears to do so; and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party.

money was what was left of a tax refund of more than twice that amount. As Ortega's tax return shows that the $1500 refund constituted nearly 15 percent of his expected annual salary, it is reasonable that he would be unlikely to have spent it all at once.

> v. <u>Condition of the Truck</u>

Finally, the government would make much of the condition of the vehicle. The sole discrepancy noted, however, is that the old, borrowed truck's right rear tire was larger than the other three, causing the truck to "list" to the left. The government did not contradict Ortega's testimony, however, that the truck drove normally and that he noticed no problems with its handling.

Our point is not to question that a Border Patrol inspector would be suspicious of the oversized tire on the borrowed truck. Rather, it is to note that Ortega, borrowing a vehicle for a one-way trip with his family, would not have been likely to examine the teeth of his gift horse. More significantly, the relatively minor discrepancy of one larger tire on the borrowed truck is properly distinguishable from more significant discrepancies like the obvious alterations that we have accepted as evidence of guilty knowledge in such cases as <u>Resio-Trejo</u>.[24]

Although readily recognizing that the government does not have to refute every possible inference pointing to innocence, we also remain faithful to our complementary rule of decision that, when circumstantial evidence and the reasonable inferences to be drawn from it permit conclusions of both guilt and innocence that are

---

[24]<u>See</u> <u>supra</u> note 19 and accompanying text.

essentially in balance, there has to be reasonable doubt.  When that is the case, we have no choice but to reverse the conviction. Our review of the record convinces us that ─── whether viewed separately or globally ─── the evidence that Ortega <u>knowingly</u> possessed the drugs in question fails to satisfy the constitutional standard of guilt beyond a reasonable doubt.

III

CONCLUSION

The evidence presented at trial does not the support the jury's finding that Ortega <u>knowingly</u> possessed the illegal drugs found in the hidden compartment of the borrowed truck's tire <u>beyond a reasonable doubt</u>.  Accordingly, we hold that the district court erred in denying Ortega's motion for acquittal and that Ortega's conviction must be ─── and therefore is ───

REVERSED.