# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3461

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Luis Jose Aponte, | * |
| | * |
| Appellant. | * |

_____

No. 09-3569

_____

Appeals from the United States
District Court for the
District of Nebraska.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Christian Tapia-Valentin, | * |
| | * |
| Appellant. | * |

_____

Submitted: April 16, 2010
Filed: September 1, 2010

_____

Before LOKEN, BRIGHT, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Luis Jose Aponte and Christian Tapia-Valentin were traveling in a sport utility vehicle near Omaha, Nebraska when law enforcement officers stopped them for a traffic violation. The officers found approximately one kilogram of a methamphetamine mixture inside the plastic lining of a round cooler located in the cargo area of the vehicle. Both men were convicted of possession with intent to distribute 500 grams or more of a methamphetamine mixture in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). In this appeal, Aponte and Tapia-Valentin contend that the district court should have granted their motions for a judgment of acquittal because the evidence was insufficient for a jury to reasonably conclude that they knew of the drugs inside the lining of the cooler. We reverse.

I.

At approximately 2:30 P.M. on January 13, 2009, Deputy Jason Bargstadt of the Douglas County Sheriff's Department stopped a Nissan Xterra because the state name on the license plate was obstructed and because it was following closely behind another vehicle. Aponte was driving the vehicle and Tapia-Valentin was a front-seat passenger. Bargstadt asked Aponte if the vehicle belonged to him. He replied that the vehicle belonged to a friend, "Victoria, Victoria, Maria Maria, Victoria Ashaga." Aponte then produced an Illinois driver's license and an Illinois registration showing that the car belonged to Maria V. Usuga. Tapia-Valentin said he did not have a driver's license, but he provided a valid passport as identification.

Aponte then accompanied Bargstadt back to the cruiser, where Bargstadt asked where the two men were going and why. Aponte stated that the two men were traveling to Cheyenne, Wyoming—although he mispronounced "Cheyenne"—to visit Aponte's cousin for a couple of days. Bargstadt then asked Aponte about the owner

-2-

of the vehicle. Aponte explained that her name was Victoria and that she used to work for Aponte at a restaurant that he owned in Chicago. Aponte could not recall Victoria's last name, but he responded affirmatively after Bargstadt asked, "Is it Usuga?" Aponte offered to call the owner of the car, but Deputy Bargstadt said "that's fine." Bargstadt then asked if Aponte was employed, and Aponte explained that he had sold his restaurant in Chicago. Next, Bargstadt asked Aponte about his relationship with Tapia-Valentin. Aponte responded that the two knew each other for about two years and that Tapia-Valentin previously lived in New York. Aponte added that Tapia-Valentin was also a former employee at the restaurant.

Another Sheriff's Department officer arrived on the scene, and Bargstadt asked Aponte to go sit in the recently arrived cruiser. After Aponte exited Bargstadt's cruiser, Bargstadt asked a DEA special agent via telephone to run criminal history checks on Aponte and Tapia-Valentin. Both checks came back negative for any record or warrants. By the time Bargstadt learned the results of the criminal history checks, a third officer arrived on the scene. While Aponte was in the second cruiser, he again said that the two men were traveling to Cheyenne to see Aponte's cousin.

Bargstadt returned Aponte's driver's license and asked if everything in the vehicle belonged to him and Tapia-Valentin, and Aponte said yes. Bargstad asked whether the vehicle contained anything illegal, including drugs, or large amounts of money. Aponte responded no to each question. Bargstad then asked for consent to search the vehicle, which Aponte granted.

Bargstadt then approached the passenger side of the vehicle and had a short conversation with Tapia-Valentin, who stated that the two men were going to Cheyenne for a couple of days to see Aponte's cousin. Tapia-Valentin also said that he lived in Chicago and used to live in New York. Upon Bargstadt's request, Tapia-Valentin exited the Xterra and entered the first cruiser. Aponte remained in the

-3-

second cruiser while the three officers began searching the vehicle on the side of the highway.

The officers focused primarily on the backseat and the area underneath the backseat, where the fuel sending unit is located. One officer opened the vehicle's back hatch and searched the cargo area for approximately forty seconds. Later, a different officer searched the cargo area for fifteen seconds. After about seven minutes of searching the vehicle on the side of the road, the officers found no drugs or money. Due to the cold temperatures, the officers asked Aponte to drive the Xterra to the sheriff's office so the officers could continue the search indoors. Aponte complied and followed Bargstadt's cruiser to the sheriff's office. While en route, Bargstad asked Tapia-Valentin, who was still in the first cruiser, why the two men were going to Cheyenne. Tapia-Valentin responded, "I don't know, because they closed the restaurant . . . [inaudible] . . . We don't got work now."

The officers resumed searching the vehicle at the sheriff's office outside the presence of Aponte and Tapia-Valentin. The officers removed all items from the vehicle, but they did not diagram or photograph the location of items prior to removal. Bargstadt and Officer Jarrod Wineinger recalled that one bag containing clothing and toiletries was in the cargo area of the vehicle, but neither officer knew who the bag belonged to, who placed the bag in the cargo area, or where the bag was located in relation to other items in the cargo area.

The officers eventually turned their attention to a round cooler in the cargo area, which contained a bottle of water, two bottles of Gatorade, and water that one officer speculated was from melted ice. The officers first noticed that the cooler's weight "didn't seem right," and then they noticed some non-factory glue seeping from the seam between the orange/red cooler exterior and the white liner. After dismantling the cooler, the officers found four baggies wrapped around the cooler's inner core. In total, the baggies contained 1,047.7 grams of a substance containing a detectable

amount of methamphetamine. No fingerprints of any value were found on the methamphetamine packaging or the outside of the cooler. Three latent fingerprints and one latent palm print were developed on the white liner of the cooler, but the prints did not match Aponte or Tapia-Valentin.

## II.

Aponte and Tapia-Valentin were indicted and tried for possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). During the government's case in chief, the jury was shown a number of photographs of the vehicle and cooler as well as a video recording from Bargstadt's dashboard camera, which included audio from a microphone on Bargstadt's uniform.[1] The government supplemented that evidence with testimony from Bargstadt and one of the other officers who participated in the search. In addition to describing the events detailed above, Bargstadt testified about his impressions from his encounters with Aponte and Tapia-Valentin. Specifically, he testified that Aponte and Tapia-Valentin answered all of his questions fully and completely and that Aponte and Tapia-Valentin told him the same thing, albeit with a few differences in pronunciation. Further, he stated that neither Aponte nor Tapia-Valentin appeared to be nervous or under the influence of drugs.

The government's final witness was Mark Lang, a criminal investigator and former police officer. Lang testified about the characteristics of a drug "mule," which he identified as a person who knowingly transports drugs from one point to another. Lang testified that, in his experience, several of the circumstances in this case were not unusual for drug mules. For example, Lang stated it is not unusual for (1) two

---

[1]There is no video of the search that occurred at the sheriff's office, and the photographs of the vehicle and cooler were all taken after the officers removed items from the vehicle.

mules to be in a car owned by an absent third party, (2) none of the mule's fingerprints to be found on the contraband, and (3) the mule to consent to search the vehicle. Lang further testified that the street value of the methamphetamine in the cooler was between $25,000 and $30,000, and that he has never encountered a situation where a drug dealer misplaced $25,000 worth of methamphetamine. On cross-examination, Lang admitted that he had no knowledge about Aponte or Tapia-Valentin and that he had no statistical data relating to the characteristics of drug mules.

At the close of the government's case, Aponte and Tapia-Valentin each moved for a judgment of acquittal, claiming that the evidence was insufficient to establish that they knew about the methamphetamine in the cooler. The district court overruled the motions, finding that there was enough evidence to satisfy the government's "fairly minimal" burden on an acquittal motion. The court stated:

> I agree with Mr. Lang's assessment that drug dealers don't usually lose track of $20,000 or $15,000 worth of drugs. Somebody knew there were drugs in that car and it's got to be one or both these individuals. And the government has proven a relationship between those two individuals. Whether that's enough for a jury to find beyond a reasonable doubt I think is for them to decide at this juncture . . . .

Aponte testified at trial, but Tapia-Valentin did not. Aponte explained that he met Tapia-Valentin while they were playing on the same soccer team in Chicago. He also stated that a third person, Miguel Lira, was supposed to join them on the trip to Cheyenne, but that Lira could not go because he found work. Aponte explained that his father was using his car on January 13, 2009, and therefore he borrowed the Xterra from Lira's mother, Maria Victoria Usuga. Aponte explained that he knew Usuga because she worked at his restaurant. Finally, Aponte testified that he did not see the cooler in the vehicle's cargo area and that he did not know there was methamphetamine in the cooler. At the close of evidence, both defendants renewed their motions for acquittal, which the district court took under advisement.

The district court instructed the jury that one element of the charged crime was that "[t]he defendant knew that he was in possession of a controlled substance." At Aponte's request, the court also included a "mere presence" instruction:

> You should understand that being present in a location where methamphetamine is found is not sufficient in itself to prove beyond a reasonable doubt that a person possessed that methamphetamine with intent to distribute as charged in the indictment.

The jury convicted both men of the single possession count. Tapia-Valentin renewed his motion for a judgment of acquittal and, alternatively, moved for a new trial. The court denied both motions, stating: "There was evidence from which the jury could infer that defendant Tapia-Valentin, as well as Aponte, knew the owner of the vehicle. Aponte testified that they all worked at his former restaurant."

Aponte and Tapia-Valentin appeal the district court's denial of their motions for acquittal, arguing that the government failed to prove beyond a reasonable doubt that they were aware of the drugs in the vehicle.[2]

III.

---

[2]Aponte and Tapia-Valentin assert several other bases for reversal that we do not address in this opinion. Both appellants argue the district court abused its discretion by admitting the generic modus operandi testimony from Lang. In addition, Aponte contends that the prosecutor improperly shifted the burden of proof during closing argument and that his sentence was unreasonable. Tapia-Valentin asserts that the district court erred by admitting evidence demonstrating that he was not a U.S. citizen. However, none of these issues merit further discussion in light of our resolution of the acquittal issue.

We review *de novo* the district court's denial of a motion for a judgment of acquittal. United States v. Hernandez-Mendoza, 600 F.3d 971, 977 (8th Cir. 2010). We must determine whether "any rational trier of fact could have found" that the evidence established the essential elements of the charged crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Gomez, 165 F.3d 650, 654 (8th Cir. 1999). "In other words, this court will reverse a conviction, including one based solely on circumstantial evidence, only if a reasonable juror must have entertained a reasonable doubt about the government's proof on an element of the offense." United States v. Flores, 362 F.3d 1030, 1035 (8th Cir. 2004). We consider the evidence in the light most favorable to the government, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the jury's verdict. Gomez, 165 F.3d at 654. However, the government is not entitled to inferences based on conjecture and speculation. United States v. Boesen, 491 F.3d 852, 858 (8th Cir. 2007).

To prove a violation of 21 U.S.C. § 841(a)(1), the government was required prove beyond a reasonable doubt that Aponte and Tapia-Valentin knowingly possessed a controlled substance. See United States v. Blakey, 449 F.3d 866, 869 (8th Cir. 2006). This case turns on whether Aponte and Tapia-Valentin were aware of the drugs inside the cooler in the back of the Xterra.

In previous cases where a defendant denied knowledge of drugs found in their vehicle, we have stated that the defendant's ownership and control over a vehicle are sufficient to infer possession of drugs therein—even if the drugs are concealed. See, e.g., United States v. Delvillar, 255 F. App'x 93, 94 (8th Cir. 2007) (unpublished per curiam) (holding that the defendant's ownership of and control over a vehicle are sufficient to support a jury's determination that the defendant knowingly possessed cocaine hidden in a secret compartment affixed to the underside of the vehicle). If a defendant did not own the vehicle, however, and especially where the defendant was in control of the vehicle for only a short time, then we have required additional proof

showing that the defendant was aware of drugs concealed in the vehicle.[3]  For example, in United States v. Mendoza-Larios, 416 F.3d 872 (8th Cir. 2005), the driver and passenger in a vehicle were both charged with possession of a controlled substance with intent to distribute after police found eight kilograms of cocaine in a hidden compartment welded within a space under the passenger-side dash.  Id. at 873.  Importantly, the defendants had borrowed the vehicle from a third party.  Id.  We stated that the defendants' presence "for hours—each driving at times—in a car containing a large amount of (concealed) cocaine . . . [w]ithout more, . . . cannot reasonably infer possession."  Id.  After analyzing the additional evidence offered by the government, we concluded that "[a] reasonable jury must have a reasonable doubt" as to the defendants' awareness of the concealed drugs.  Id. at 876; see also United States v. Pace, 922 F.2d 451, 452–53 (8th Cir. 1990) (holding that a jury must have had reasonable doubt as to whether the defendant knew about 200 pounds of cocaine in the vehicle he was helping to drive from Los Angeles to Chicago).

Before we address the government's proof, we make two observations.  First, the evidence shows that the drugs were well-hidden inside the cooler located in the cargo area of the Xterra.  Our precedent instructs that, when drugs are found in a hidden compartment, an important consideration is whether the compartment was

---

[3]This analysis is consistent with the leading approach among our sister circuits, which is to require additional proof of knowledge in cases involving hidden compartments.  See United States v. Ortega Reyna, 148 F.3d 540, 544 (5th Cir. 1998); see also United States v. Jackson, 55 F.3d 1219, 1226 (6th Cir. 1995) (following the Fifth Circuit's approach); United States v. Stanley, 24 F.3d 1314, 1319–20 (11th Cir. 1994) (same).  But see United States v. Cota-Meza, 367 F.3d 1218, 1224 (10th Cir. 2004) (declining to follow the Fifth Circuit's approach).  This approach is grounded in a "recognition that, in hidden compartment cases, there 'is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise.'  This assumption is heightened when, as here, the vehicle is a 'loaner' or has otherwise been in the possession of the suspect for only a short time."  Ortega Reyna, 148 F.3d at 544 (footnotes and citations omitted).

obvious to a member of the general public. Mendoza-Larios, 416 F.3d at 876 (refusing to impute knowledge of drugs in a secret compartment to defendants, neither of which owned the vehicle, because the irregularities with the compartment were "not obvious to a general member of the public, and [because], from outward appearances, the dash looked like any other dash"); see also Ortega v. United States, 270 F.3d 540, 547 (8th Cir. 2001) (affirming a conviction based in part on "obvious signs of tampering with the car"). Here, the photographic evidence shows a small amount of yellow glue protruding from the cooler. Though that off-color glue is visible in the photograph taken at a very close distance, it is not noticeable in the photograph taken from further away. No evidence suggests that Aponte or Tapia-Valentin saw the cooler—much less that they inspected the cooler at a close enough distance to notice an irregularity. The government acknowledges in its brief that the cooler was "disguised to look as if it were a normal everyday cooler." In sum, the cooler's appearance, as observed from a normal distance, did not suggest an obvious problem.

Indeed, we emphasize that three officers, who were trained to find narcotics, searched the vehicle for nearly seven minutes, approximately fifty-five seconds of which was spent searching the vehicle's cargo area. In that time, the officers never turned their attention to the cooler, much less the problem with the cooler's lining. Wineinger testified that the officers first recognized an irregularity with the cooler when they began removing the contents of the vehicle—specifically, when they lifted the cooler and "noticed that the weight of the cooler didn't seem right." It is highly unlikely that an unsuspecting member of the general public would have noticed a problem with the cooler in the small amount of time it takes to place a piece of luggage in a vehicle.

Our second observation is that the common indicia of guilty consciences were not present in this case. Bargstadt testified that Aponte and Tapia-Valentin answered his questions completely and without apparent nervousness. Cf. United States v. Timlick, 481 F.3d 1080, 1084 (8th Cir. 2007) (affirming a conviction based, in part, on testimony that the defendant "was nervous and flustered during the traffic stop");

<u>United States v. Cortez</u>, 935 F.2d 135, 143 (8th Cir. 1991) (consciousness of guilt was supported by defendant's evasive answers and his inquiry, "What's in it for me?" when asked if he would cooperate). <u>But see</u> <u>Pace</u>, 922 F.2d at 453 (jury must have had reasonable doubt even though the defendant "appeared nervous and fidgety during the questioning"). Further, the government offered no evidence showing that the proffered explanation for traveling to Cheyenne—to visit Aponte's cousin—was implausible or false. <u>Cf.</u> <u>United States v. Marquez</u>, 462 F.3d 826, 829–30 (8th Cir. 2006) (convictions supported by false bill of lading, false log books, and the implausible explanation that commercial truck drivers had no knowledge of the contents in their trailer); <u>Flores</u>, 362 F.3d at 1036 (8th Cir. 2004) (convictions affirmed based, in part, on evidence in the vehicle that directly contradicted the defendant's statements to officers); <u>see also</u> <u>United States v. Butler</u>, 238 F.3d 1001, 1004 (8th Cir. 2001) (implausible story); <u>United States v. Martinez</u>, 168 F.3d 1043, 1048 (8th Cir. 1999) (same). Moreover, there was no evidence linking Aponte or Tapia-Valentin to previous drug use or to the hidden compartment containing drugs. <u>Cf.</u> <u>Hernandez-Mendoza</u>, 600 F.3d at 977 (tools used to access the hidden compartment found in vehicle); <u>United States v. Jiminez</u>, 478 F.3d 929, 933 (8th Cir. 2007) (defendant had other drugs in her purse); <u>Flores</u>, 362 F.3d at 1036 (materials used to conceal the drugs were found in the passenger compartment of the vehicle); <u>United States v. Willis</u>, 89 F.3d 1371, 1377 (8th Cir. 1996) (relying in part on passenger's previous drug trafficking and possession of drug paraphernalia); <u>United States v. Ojeda</u>, 23 F.3d 1473, 1476 (8th Cir. 1994) (defendant's fingerprints were on the drug packages and pins used to access the secret compartment were found in the defendant's visor).[4]

_____

[4]This is not an exhaustive list of circumstances that may establish that a defendant knowingly possessed a controlled substance. We have also relied on a defendant's lack of surprise when drugs are discovered, <u>see</u> <u>Hernandez-Mendoza</u>, 600 F.3d at 978; <u>United States v. Serrano-Lopez</u>, 366 F.3d 628, 636 (8th Cir. 2004), evidence of flight or escape, <u>see</u> <u>Ortega v. United States</u>, 270 F.3d 540, 546 (8th Cir. 2001), an obvious odor of drugs or an agent typically used to mask the odor of drugs, <u>see</u> <u>Marquez</u>, 462 F.3d at 829; <u>Flores</u>, 362 F.3d at 1034; <u>Ojeda</u>, 23 F.3d at 1476, and

The government asserts that other circumstantial evidence supports the jury verdict. First, the government argues that the location of the luggage in the vehicle is enough to infer the Appellants' knowledge of drugs within the cooler. Crediting the testimony from Bargstadt and Wineinger, we assume that there was one piece of luggage in the vehicle, it was located in the cargo area, and Aponte or Tapia-Valentin placed it there.[5] However, Aponte denied seeing the cooler in the cargo area and nothing in the record suggests that the cooler was visible to whomever placed the luggage in the cargo area. Neither officer testified as to the bag's location in relation to the cooler, and the officers did not photograph, diagram, or document the items in the vehicle's cargo area before they removed the items. The video recording from dashboard camera reveals what appears to be a piece of luggage in the cargo area of the vehicle, but the red cooler is not noticeable. Without additional evidence that Aponte or Tapia-Valentin actually saw the cooler or must have seen the cooler, there is no reasonable inference that they were aware the cooler was in the vehicle—much less, that they knew the cooler's interior lining had been replaced with drugs. See Pace, 922 F.2d at 453 (no reasonable inference that the defendant knew about drugs in luggage located in the cargo area of a station wagon without additional evidence that he "ever explored the cargo area of the station wagon, much less that he examined or opened [the] luggage that was stored there.").

Second, the government argues that Aponte and Tapia-Valentin told inconsistent stories when asked about the purpose of their trip. To be sure, we have

_____

the presence of other circumstances consistent with drug trafficking, see Hernandez-Mendoza, 600 F.3d at 977 (four cell phones in the vehicle); Jiminez, 478 F.3d at 933 (defendant planned to leave the vehicle in a parking lot in Minneapolis but had no return airline ticket or money to purchase one).

[5]Aponte testified that he placed his luggage in the back seat of the vehicle. However, our standard of review requires that we resolve this conflict in favor of the government. Gomez, 165 F.3d at 654.

-12-

stated that a jury may infer knowledge of drugs in a vehicle based on inconsistencies within or between the defendants' stories. See Delvillar, 255 F. App'x at 95 (relying in part on inconsistencies between defendants' stories); Timlick, 481 F.3d at 1084 (same); Martinez, 168 F.3d at 1048 (relying in part on a defendant's inconsistent answers). But see Mendoza-Larios, 416 F.3d at 875–76 (holding that the evidence was insufficient to prove that the defendants knew about drugs hidden in their vehicle despite four inconsistencies between the defendants' statements). Aponte stated twice—albeit with difficulty in pronunciation—that the men were going to Cheyenne to visit Aponte's cousin. Tapia-Valentin said the same thing when first asked about the purpose of the trip. Later, when Bargstadt asked Tapia-Valentin again why the men were going to Cheyenne, Tapia-Valentin responded, "I don't know, because they closed the restaurant . . . [inaudible] . . . We don't got work now." Bargstadt testified that he did not find this answer to be inconsistent with the previous statements, and neither do we. Tapia-Valentin did not contradict the earlier statements about the trip's destination and purpose. In any event, this insignificant potential inconsistency is not enough on its own to establish knowledge of drugs hidden in a vehicle. See Mendoza-Larios, 416 F.3d at 875–76.

Third, the government contends, and the district court agreed, that a jury could reasonably infer that Aponte and Tapia-Valentin knowingly possessed the drugs in the Xterra from the fact that both men knew the vehicle's owner.[6] However, the record is void of any incriminating information about the owner of the vehicle—much less that Aponte and Tapia-Valentin knew of such information. As such, the government's argument is pure speculation, which cannot support a jury verdict. See Pace, 922 F.2d at 453 ("While reasonable inferences from the evidence weigh against the defendant, speculation does not."). Moreover, both of the defendants in Mendoza-Larios knew the owner of the vehicle, see 416 F.3d at 875 (examining the defendants' stories about

_____

[6]This argument is actually the reverse of what the government argued at trial. During closing arguments, the government asserted that Aponte's *inability* to quickly recall Ms. Usuga's name was evidence of guilt.

-13-

how the owner of the vehicle recruited them for the trip), and therefore, knowing the owner of a vehicle, alone, cannot be enough to establish knowledge of drugs hidden in the vehicle.

Fourth, the government stresses that Aponte and Tapia-Valentin were unemployed at the time they were arrested. The government cites no authority for the position that a reasonable jury may infer a criminal state of mind, in general, or knowledge of drugs concealed in a vehicle, in particular, based on someone's employment status. Though drug dealing is surely profit-driven in some circumstances, being unemployed is not enough to reasonably infer that someone knows about drugs concealed in a borrowed vehicle.

Fifth, the government relies on Officer Lang's testimony that the drugs in the cooler had a street value between $25,000 and $30,000 and that he had never encountered a situation where a drug dealer misplaced $25,000 worth of methamphetamine. Read broadly, the government's argument is that the unknowing courier defense is implausible. Or stated differently, a person's mere presence in a vehicle containing drugs is enough to infer that the person knows about the drugs.[7] Our precedent clearly forecloses this result. See Mendoza-Larios, 416 F.3d at 876 (reversing driver and passenger's conviction when eight kilograms of cocaine were found under the dash); Pace, 922 F.2d at 453 (reversing a conviction of a passenger in a vehicle containing drugs worth between $12 and $15 million because there was insufficient evidence to prove the passenger was aware of the drugs).

---

[7]See Massachusetts v. Garcia, 569 N.E.2d 385, 392 (Mass. 1991) ("The Commonwealth argues that it is unlikely that anyone would lend a vehicle containing such valuable contents unless the borrowers knew of those contents, and that therefore a jury could infer that both Heredia and Garcia knew of the cocaine. This argument is simply another way of stating that one can infer knowledge of contraband from its presence in a vehicle.").

-14-

Read narrowly, the government's argument is that the drugs here were valuable enough to reasonably infer that the defendants were aware of the drugs in the vehicle. Our court has endorsed this logic. In Serrano-Lopez, the police found nearly six kilograms of cocaine in hidden compartments in the defendants' vehicle. 366 F.3d at 632. In affirming the defendants' convictions, we relied in part on the "large quantity of drugs involved." Id. at 635. We stated, "Even if the drugs were not owned by the defendants, it is unlikely that the owner would place approximately $130,000 worth of cocaine in the hands of people who do not even know it is there." Id. More recently, in Hernandez-Mendoza, we affirmed the defendants' convictions relying in part on the logic that "it is reasonable to infer that a third party was unlikely to entrust a vehicle with such valuable merchandise to unwitting couriers." 600 F.3d at 977 (seized drugs had a street value of at least $80,000); see also Marquez, 462 F.3d at 830 ("The innocent courier defense is inherently less plausible for commercial truck drivers transporting a bulky, $10 million load of marijuana than for the defendants in Mendoza-Larios and Pace, who transported lesser quantities of cocaine that were well hidden in other people's cars.").

We must disagree, however, that guilty knowledge may be inferred solely from the quantity or value of drugs seized in this case. While we appreciate Officer Lang's logic, we are unaware of any case in which the drugs' value was the only circumstantial evidence to indicate the occupants were aware of drugs in their vehicle. Neither Serrano-Lopez nor Hernandez-Mendoza relied exclusively on the quantity or value of drugs in the vehicle—both of those cases involved abundant circumstantial evidence proving that the defendants knew about the drugs in their vehicles. Moreover, if we held that $25,000 worth of methamphetamine is sufficient to infer knowing possession, we could not reconcile that result with Mendoza-Larios, in which police found *eight kilograms* of cocaine hidden in the vehicle.[8]

---

[8]Although there is no evidence in this record about the value of cocaine, we have little doubt that eight kilograms of cocaine would be worth much more than $25,000.

The government could, but does not, argue that Aponte's representation to Bargstadt that everything in the Xterra belonged to him or Tapia-Valentin is direct evidence of knowing possession. However, the record is still lacking any evidence that Aponte saw the cooler or must have seen the cooler, and therefore, his representation to Bargstadt is of no probative value. Morever, the circumstances surrounding Bargstadt's generic question are telling. Bargstadt posed this question before the search began and without reference to a particular area or item in the vehicle. We believe no rational jury could reasonably infer from Aponte's response, given these circumstances, that he knew about the cooler and the drugs secreted inside the cooler.

Finally, even considereding all of these circumstances in their totality, we conclude the evidence is insufficient to prove beyond a reasonable doubt that Aponte or Tapia-Valentin knew about the drugs within the cooler.

## IV.

For the foregoing reasons, we hold that a reasonable jury must have had reasonable doubt as to Aponte's and Tapia-Valentin's awareness of the drugs inside the cooler in the back of the Xterra. The district court erred by denying their motions for a judgment of acquittal. The convictions are reversed.

LOKEN, Circuit Judge, dissenting.

The majority opinion accurately summarizes the traffic stop, the consensual search of the vehicle Luis Aponte was driving from Chicago to Cheyenne, Wyoming, and the discovery of a significant quantity of methamphetamine secreted inside the lining of a cooler found in the Nissan Xterra's cargo area. The majority also fairly recounts the government's case-in-chief and Aponte's trial testimony, except it omits his significant admission on cross-examination that he never told the investigating

-16-

officers that Miguel Lira, purportedly the son of the vehicle's owner, Maria Victoria Usuga, originally intended to join Aponte and Tapia-Valentin on the trip to Wyoming but got a job the day before they departed and simply delivered Usuga's vehicle to Aponte. The majority fails to consider, however, what a jury could reasonably conclude if it rationally *disbelieved* all or substantially all of Aponte's self-serving testimony. I conclude disbelief is entirely rational on this record. Therefore, as we are obliged to draw all reasonable inferences and resolve all evidentiary conflicts in favor of the jury verdict, I submit we must assume the jury discredited Aponte's testimony. Combined with the government's circumstantial evidence, this provides sufficient evidence to find, beyond a reasonable doubt, that the defendants knowingly possessed the methamphetamine. Accordingly, I respectfully dissent.

Aponte testified at trial that he and his passenger, Tapia-Valentin, were unemployed after Aponte's restaurant closed and were driving to Cheyenne to attend a party at his cousin's home, though he did not know her address. According to Aponte, Miguel Lira intended to make the trip to Cheyenne but did not because he had found work. Instead, Lira loaned Aponte a car that belonged to Lira's mother, who was a former cook at Aponte's restaurant, and delivered the vehicle to Aponte's house the night before Aponte and Tapia-Valentin began the trip. Aponte claimed that he put his bag in the back seat of the Xterra, never saw the cooler in the cargo area, and had no knowledge of the cooler's contents. He admitted that he owned or had access to two other vehicles at the time he borrowed Usuga's car for the trip.

There are many reasons a rational jury could disbelieve Aponte's testimony that he did not know what was hidden, not too carefully, in the cooler's lining.

- Aponte was unemployed and had access to two other vehicles, yet he implausibly claimed to be driving half-way across the country in a borrowed vehicle to attend a one-day party at a cousin's home, having never been to Cheyenne and not knowing his cousin's address.

-17-

- The jury viewed a video recording of the traffic stop that impeached Aponte's testimony in several respects. When first asked why he was going to Cheyenne, Aponte said that his cousin lived there, but did not mention a party. Tapia-Valentin then gave an inconsistent answer about the purpose of the trip, telling Officer Bargstadt they were going to attend a party with Aponte's cousin. When Aponte was then asked whether he planned to party in Cheyenne, Aponte said yes but added, "we're not going crazy." When Tapia-Valentin was then asked again about the purpose of the trip, he replied, "I don't know, because they closed the restaurant . . . [inaudible] . . . We don't got work now."

- Aponte testified he knew Usuga's last name when the police questioned him, an assertion directly contradicted by the video.

- Aponte testified that he put his bag in the back seat and never saw the cooler in the cargo area, but the video showed a bag in the cargo area, and the officers testified there was only one bag in the vehicle when they searched it.

The majority improperly analyzes these pieces of evidence in isolation; the issue is whether a reasonable jury could draw an inference of knowledge from the totality of the circumstances. See United States v. Serrano-Lopez, 366 F.3d 628, 636 (8th Cir. 2004); United States v. Butler, 238 F.3d 1001, 1003 (8th Cir. 2001).

- Perhaps most significantly, as the government emphasized in closing argument, Aponte's story carefully avoided incriminating either Lira or Usuga despite describing a scenario in which someone connected with the closed restaurant almost surely was responsible for the shipment of methamphetamine that left Chicago. This is not a case like United States v. Pace, 922 F.2d 451, 453 (8th Cir. 1990), where the passenger co-defendant testified that Pace was merely hired to drive a car containing the passenger's concealed cocaine. Here, Aponte and Tapia-Valentin were obvious "insiders" for a long trip, the principal purpose of which was drug trafficking. This brings into sharp and incriminating focus the government's evidence that it is unlikely

drug dealers would misplace $25,000 worth of methamphetamine, or put this valuable contraband "in the hands of people who do not even know it is there." Serrano-Lopez, 366 F.3d at 635.

In these circumstances, a reasonable jury could find that Aponte's explanation for the trip was a cover story to hide what Aponte and Tapia-Valentin knew was their true purpose, to deliver the methamphetamine hidden in the cooler. It was for the jury to determine whether Aponte's denial of knowledge was too implausible to be true. Its credibility finding is, according to a host of Eighth Circuit decisions, "virtually unreviewable on appeal." E.g., United States v. Morris, 327 F.3d 760, 761 (8th Cir.), cert. denied, 540 U.S. 908 and 920 (2003). Instead, contrary to our proper function as an appellate court, the majority reverses a jury verdict because, as jurors considering only the cold record on appeal, they would have acquitted these defendants. I would affirm both convictions.

_____